No. 17-1838

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| KEVIN CZECH, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | Appeal from the United States |
| | ) | District Court for the Northern |
| v. | ) | District of Illinois, |
| | ) | Eastern Division |
| MICHAEL MELVIN, Warden | ) | |
| Pontiac Correctional Center, | ) | No. 14-cv-02012 |
| | ) | |
| Respondent-Appellee. | ) | Judge Robert W. Gettleman |

## BRIEF AND REQUIRED SHORT APPENDIX
## OF PETITIONER–APPELLANT KEVIN CZECH

James T. Malysiak
Aaron J. Hersh
JENNER & BLOCK, LLP
353 North Clark Street
Chicago, Illinois 60654-3456
(312) 222-9350
*Counsel for Petitioner-Appellant*

Dated: July 13, 2017

## ORAL ARGUMENT REQUESTED

CIRCUIT RULE 26.1  DISCLOSURE STATEMENT

Appellate Court No: <u>17-1838</u>

Short Caption: <u>Kevin Czech v. Michael Melvin</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire  statement and to use N/A for any information that is not applicable  if this form is used.

[  ]      PLEASE CHECK  HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE  WHICH  INFORMATION IS NEW OR REVISED.

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

<u>Kevin Czech</u>

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Jenner & Block LLP</u>

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

Attorney's Signature: _____      Date: <u>May 8, 2017</u>

Attorney's Printed Name: <u>James T. Malysiak</u>

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d).   Yes  <u>X</u>      No _____

Address: <u>353 N. Clark St., Chicago IL 60654</u>

Phone Number: <u>312-923-2813</u>                    Fax Number:

E-Mail Address: <u>jmalysiak@jenner.com</u>

rev. 01/08 AK

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>17-1838</u>

Short Caption: <u>Kevin Czech v. Michael Melvin</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

[  ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Kevin Czech

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Jenner & Block LLP

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

Attorney's Signature: _____    Date: <u>May 8, 2017</u>

Attorney's Printed Name: <u>Aaron J. Hersh</u>

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d).    Yes <u>X</u>    No _____

Address: <u>353 N. Clark St., Chicago IL 60654</u>

Phone Number: <u>312-840-7412</u>    Fax Number: _____

E-Mail Address: <u>ahersh@jenner.com</u>

rev. 01/08 AK

**TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT ........................................................... 1

ISSUE PRESENTED FOR REVIEW ..................................................... 2

STATEMENT OF THE CASE ............................................................... 3

I.     UNDERLYING MURDER OFFENSE ......................................... 3

II.    THE PROSECUTION'S TRIAL STRATEGY ............................... 6

III.   MR. CZECH'S APPEAL AND HABEAS PROCEEDINGS........................... 9

SUMMARY OF ARGUMENT ........................................................... 11

ARGUMENT ....................................................................................... 13

I.     THE DISTRICT COURT ERRED IN DENYING MR. CZECH'S PETITION
       FOR A WRIT OF HABEAS CORPUS. ...................................... 13

       A.    The District Court's Conclusion That Mr. Czech's Conviction
             Based On A General Verdict Did Not Have Substantial And
             Injurious Effect Is Subject to a De Novo Standard of Review. ...... 13

       B.    The District Court Did Not Adequately Consider The Impact
             The Erroneous Felony Murder Instruction Likely Had On The
             Jury. ............................................................................. 15

       C.    The District Court Erroneously Concluded That The
             Evidence Of Mr. Czech's Guilt Was Overwhelming. ..................... 26

CONCLUSION ................................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Blackston v. Rapelje*,
780 F.3d 340 (6th Cir. 2015) ................................................... 28

*Brecht v. Abrahamson*,
507 U.S. 619 (1993) ........................................................ 13, 22

*California v. Roy*,
519 U.S. 2 (1996) ........................................................... 15, 16

*Chapman v. California*,
386 U.S. 18 (1967) ....................................................10, 13, 23

*Dassey v. Dittmann*,
— F.3d —, 2017 WL 2683893 (7th Cir. June 22, 2017)........................... 13

*Davis v. Ayala*,
135 S. Ct. 2187 (2015) ......................................................... 26

*Illinois v. Davison*,
923 N.E.2d 781 (Ill. 2010) ..................................................... 21

*Jenkins v. Nelson*,
157 F.3d 485 (7th Cir. 1998) ............................................... 15, 17

*Jensen v. Clements*,
800 F.3d 892 (7th Cir. 2015) ......................................... *passim*

*Jensen v. Romanowski*,
590 F.3d 373 (6th Cir. 2009) .................................................. 22

*Jones v. Basinger*,
635 F.3d 1030 (7th Cir. 2011) ................................................. 13

*Kotteakos v. United States*,
328 U.S. 750 (1946) ....................................................13, 14, 22

*O'Neal v. McAninch*,
513 U.S. 432 (1995) ................................................13, 14, 26, 30

*Sorich v. U.S.*,
709 F.3d 670 (7th Cir. 2013) .......................................14, 15, 19

*Statler v. Garcia,*
  78 Fed. Appx. 22 (9th Cir. 2003)................................................. 30

*Stromgberg v. California,*
  283 U.S. 359 (1931) ........................................................ 10, 19

*Sullivan v. Louisiana,*
  508 U.S. 275 (1993) ........................................................ 16, 22

*Yates v. United States,*
  354 U.S. 298 (1957) .............................................................. 10

**STATUTES**

28 U.S.C. § 1291 ...................................................................... 2

28 U.S.C. § 1331 ...................................................................... 1

28 U.S.C. § 2254 ................................................................. 1, 10

## JURISDICTIONAL STATEMENT

Petitioner-Appellant Kevin Czech appeals from a judgment denying his petition for a writ of habeas corpus in the United States District Court for the Northern District of Illinois, Eastern Division.

The district court had jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 2254. On March 20, 2014, Mr. Czech filed his petition for a writ of habeas corpus. *See, e.g.*, Dkt. 1 at 6, 12, 15; A-1.[1] Mr. Czech challenged his first-degree murder conviction in the Circuit Court of Cook County, Illinois, arguing that (1) his appellate counsel was ineffective, (2) his Due Process rights were violated when the jury instructions included an invalid type of murder offense not requiring intent for a conviction and the jury returned a general verdict which may have been based on the legally invalid felony murder, and (3) his trial counsel was ineffective. *Id.* Following initial briefing on Mr. Czech's petition, on August 3, 2016, the district court rejected Mr. Czech's ineffective assistance of counsel claims but ordered supplemental briefing on Mr. Czech's Due Process claim based on the possibility that his conviction was erroneously based on the legally invalid felony murder theory. (A-20.)

Specifically, the district court sought briefing addressing whether the jury's return of a general first-degree murder verdict that could have been based on the felony murder charge not only violated Mr. Czech's Due Process rights, as the

---

[1] Citations to "Dkt. _" are to the district court docket below, 1:14-cv- 2012, and to the page number assigned by the ECF filing system noted in the page header; citations to "7th Cir. Dkt._" are to this Court's docket; citations to "A-_" are to the required short appendix bound with this brief; citations to "SA-_" are to the separate appendix submitted with this brief.

district court held, but also had a substantial and injurious effect in determining the jury's verdict. (A-20.) The district court appointed James T. Malysiak, a Jenner & Block, LLP partner, to represent Mr. Czech in submitting the supplemental briefing. Dkts. 18, 25. The harmless error issue was fully briefed, and on March 24, 2017, the district court denied Mr. Czech's petition for a writ of habeas corpus. The district court issued a certificate of appealability. (A-40 – A-41.)

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. Mr. Czech timely filed his notice of appeal on April 20, 2017. Dkt. 37.

## ISSUE PRESENTED FOR REVIEW

Petitioner-Appellant Kevin Czech's first-degree murder conviction was based on a general verdict, but the jury reaching that verdict was instructed not only on the conventional elements of first-degree murder, including *mens rea*, but was also instructed that first-degree murder could be based on the commission of a felony—here, aggravated discharge of a firearm—that caused the victim's death. The Illinois Appellate Court concluded on direct appeal that the felony murder instruction was improper under Illinois law because the separate felony was directly involved in causing the alleged murder. The district court concluded that the felony murder instruction was a constitutional violation but denied Mr. Czech's petition for a writ of habeas corpus on the ground that, given the "overwhelming evidence" supporting the first-degree murder verdict, the erroneous and constitutionally defective felony murder instruction was harmless. Did the district court err in concluding that the invalid felony murder instruction did not have a substantial and injurious effect on the jury even

though the jury was instructed, and the prosecution argued, that the jury could reach a valid first-degree murder verdict without the need to find that Mr. Czech had the otherwise required intent?

## STATEMENT OF THE CASE

### I.     UNDERLYING MURDER OFFENSE

Petitioner-Appellant Kevin Czech was convicted for his role in gang-related drive-by shooting that occurred on September 24, 1999.[2] (A-2.) The shooting left Alonzo Zuniga dead. (*Id.*) Mr. Czech was a member of the Maniac Latin Disciples street gang, and the shooting occurred in an area of Chicago claimed by a rival gang, the Latin Kings. (*Id.*) At the time of the shooting, Mr. Czech was with Roberto Mejia, Nancy Malave, and Marquis Falls (also known as "Smiley"), who at the time was 13 years old. (*Id.*; SA-128.)

Mr. Mejia picked up Ms. Malave in his car, a gray Buick LeSabre, and then proceeded to pick up Mr. Czech. (A-3.) While the initial plan for the evening was for Mr. Mejia, Ms. Malave, Mr. Czech, and Mr. Czech's girlfriend to go to the movies, after Mr. Mejia picked Mr. Czech up, Mr. Czech directed Mr. Mejia to pick up Mr. Falls and "cruise by the Kings." (*Id.*)[3] After the group picked up Mr. Falls, Mr. Mejia drove Mr. Falls to the alley to retrieve a pistol. (*Id.*) Mr. Falls

---

[2] The factual background provided below is taken from the Illinois Appellate Court's decision (SA-368 – SA-378) and the district court's recitation of those facts in its August 3, 2016 opinion. The facts recited below are supplemented by citations to the trial record contained in the Separate Appendix.

[3] Mr. Falls, at 13 years old, was not old enough to be a full-fledged member of the Maniac Latin Disciples. (A-3.) Given his youth, he was a "pee-wee." (*Id.*) Falls testified that a month before the shooting, Petitioner gave him a pistol to hold for the gang, and that Mr. Falls kept the pistol in an alley behind a garbage can, wrapped in a plastic bag. (*Id.*; *see also* SA-110 – SA-112.)

returned to the car with the gun.

Mr. Mejia was driving, Ms. Malave was sitting in the front passenger seat, and Mr. Czech and Mr. Falls were in the backseats. (*Id.*) According to Mr. Falls's testimony at trial, after the pistol was retrieved, a plan was made to drive by a known gathering spot of the Latin Kings, and to shoot at them. (*Id.*) Mr. Mejia ultimately drove the group to the block on which Mr. Zuniga[4] and members of the Latin Kings street gang were gathered. (A-3.) At this point, Mr. Mejia drove by them and Mr. Czech said "King love" to the group and made Latin King gang-signs with his hands. (*Id.*) Mr. Mejia then drove around the block. (*Id.*) At about this time, Ms. Malave (who was sitting in the front-passenger seat) switched seats with Mr. Falls, so that he climbed into the front-passenger seat and she climbed into a backseat, where Mr. Czech was also sitting. (*Id.*)

As noted above, the testimony concerning Mr. Czech's formulation of the plan to retrieve the pistol and shoot at the Latin Kings was offered at trial almost exclusively by Mr. Falls, who had already pleaded guilty as a juvenile to the murder of Mr. Zuniga and had agreed to testify for the prosecution against Mr. Czech. (A-4; SA-107 – SA-149.) However, when the State elicited Mr. Falls's testimony about the plan to retrieve the gun and to shoot at the Latin Kings, Mr. Falls contradicted himself, referring at one moment to Mr. Czech being in the front seat, and then stating that Mr. Czech was, in fact, in the back seat with Mr. Falls. (SA-118.) Falls also contradicted himself with respect to who directed Ms. Malave to switch seats with him. He first told the jury that it was Mr. Czech's

---

[4] The record reflected that Mr. Zuniga was not a member of a gang.

idea for Mr. Falls to switch seats with Ms. Malave, and then, moments later, testified, "I can't really remember" in response to the same question, and then testified that Mr. Falls himself asked Ms. Malave to switch seats. (SA-122.) He also testified that he, as opposed to Mr. Czech, directed Ms. Malave to switch seats with him so that he could fire from the front seat, where the windows rolled down all the way. (SA-95, SA-102, SA-140.)[5]

Moreover, Ms. Malave testified that Mr. Falls instructed her to switch seats with him (SA-79), testimony which contradicted Mr. Falls's testimony that Mr. Czech directed the pair to switch seats. Likewise, Ms. Malave testified that Mr. Czech suggested only that they "cruise by the Kings" but did not suggest that anyone in the group shoot at them. She also testified that it was Mr. Falls, not Mr. Czech, who directed Mr. Mejia to drive to the alley, where Mr. Falls retrieved the pistol. (SA-91 – SA-92.) Indeed, Mr. Falls testified that Mr. Czech did not direct Mr. Mejia where to drive the car or, once they reached the block on which members of the Latin Kings were standing, to drive around the block. (SA-149.) Additionally, Chicago Police Detective Healy testified that in his first unrecorded statement to her, Mr. Czech had not told her that he had directed Mr. Mejia to the alley. (SA-241.) This testimony, in aggregate and along with questions concerning Mr. Falls's credibility given his plea bargain with the prosecution,

---

[5] At the conclusion of the State's case in chief, the State and Mr. Czech stipulated that had Chicago Police Detective Rutherford been called as a trial witness, he would have testified that when he first took Mr. Falls's statement, he "denied doing the shooting but said it was [Mr. Czech] that had actually done the shooting." (SA-283.) Mr. Falls, in his trial testimony, thus directly contradicted his previous statement made to Detective Rutherford.

undermined the prosecution's principal factual contention that Mr. Falls retrieved the pistol and fired the weapon at Mr. Czech's direction.

After the car circled the block, Mr. Falls testified that he had the pistol (SA-121 – SA-122) and that, at Mr. Czech's direction, he fired five shots at the group of people on the corner. (*Id.*; A-4.) One of the bullets struck and killed Mr. Zuniga. (A-4.) Mr. Czech was later arrested and said that he was involved in the shooting. (*Id.*)

The State presented the testimony of Detective Barbara Healy, one of the detectives who investigated the murder, and she testified about the videotaped statement Mr. Czech gave. She testified that Mr. Czech's videotaped statement differed from his initial, non-recorded statement, in that in his later statement he minimized his role in the shooting. (SA-233.) Detective Healy did not attempt to record the first statement (A-4, n. 2), and consequently Mr. Czech could neither review nor sign the statement. (SA-246.) Specifically, in his second statement, Mr. Czech did not state that he directed Mr. Mejia to drive into the alley and did not tell Ms. Malave to switch seats with Falls. (SA-241 – SA-242.) In this respect, Mr. Czech's videotaped statement was evidently consistent with the testimony of Ms. Malave, and also with one version of Mr. Falls's shifting testimony. Likewise, Mr. Czech did not say in the videotaped statement that he directed Mr. Falls to fire the weapon at anyone (SA-242 – SA-243.)

## II.    THE PROSECUTION'S TRIAL STRATEGY

At trial, the State presented, among others, Mr. Falls, Ms. Malave, and Detective Healy as witnesses. The State emphasized the felony murder theory

as a basis for convicting Mr. Czech.  In the State's closing argument, the State's Attorney emphasized first the predicate felony of aggravated discharge of a firearm, and then segued to a discussion of first degree murder and legal responsibility.  (SA-313 – SA-314.)  The State's Attorney then told the jury that the State had presented sufficient evidence showing that Mr. Falls "knew that what he was doing[,] that firing the gun at that group of people created a strong probability of death or great bodily harm to [the victim] or another."  (SA-316.) The State's Attorney then explicitly told the jury that it could convict Mr. Czech of first-degree murder based solely on felony murder instruction even if Mr. Czech did not intend that anyone would be killed:

> *Even if you're inclined to give this Defendant the benefit of any conceivable doubt* to think well he didn't want anybody to get hurt; for some reason feel sorry for him.  Thinking he was just maybe looking to scare somebody; not having [Falls] fire those shots.  *The fourth option on that second prong he was committing the offense of aggravated battery of a discharge [sic].  Even if you think he was out there to commit an aggravate[d] discharge of a firearm, even if you think he was out there for a shooting to scare these guys, that's enough.  That is enough to commit him to be responsible for him to be guilty of murder.*  And if there is any further doubt about that, [the judge] will further instruct you with respect to this felony murder concept.

> That to sustain the charge of first degree murder it is not necessary for the State to show that it was or may have been the original intent of the Defendant or one for whose conduct he is legally responsible for killing the deceased [victim].  It is sufficient if the jury believes from the evidence beyond a reasonable doubt that the defendant and one for whose conduct he is legally responsible combined to do an unlawful act such as to commit aggravated discharge of a firearm and the deceased was killed by one of the parties committing the unlawful act.  *Even if you think that he just wanted there to be some shots.  Even if you think he didn't want anybody to get hurt.  Under the law which you've all sworn to follow, that's enough.  That is enough to establish his guilt on the charge of murder.  Under the theory of felony [sic].  That's enough.*  He is guilty.  I submit that

should be your verdict.

(SA-317 – SA-318) (emphasis added).)  The State's Attorney concluded his closing statement by emphasizing the charge of aggravated discharge, the purported predicate felony for the felony murder theory, stating Mr. Czech "is guilty.  Guilty of first degree murder.  Guilty of aggravated discharge."  (SA-319.)

In instructing the jury, the trial court emphasized the felony murder instruction, by informing the jury that, "It is sufficient if the jury believes from the evidence beyond a reasonable doubt that the Defendant and one for whose conduct he is legally responsible combined to do an unlawful act, such as to commit aggravated discharge[] of a firearm and that the deceased was killed by one of the parties committing that unlawful act."  (SA-353 – SA-354.)  Only *after* giving that felony murder instruction did the court instruct the jury on the standard elements of first-degree murder.  (*See* SA-354.)

With respect to Mr. Czech's intent, the trial court instructed the jury that it should find Mr. Czech guilty of first-degree murder if he: (1) intended to kill the victim; (2) caused great bodily harm to the victim or took an action that he knows would cause death to the victim; (3) knew that there was a strong probability of great bodily harm; or (4) *the victim's death occurred during the course of committing a felony*, which here was the aggravated discharge of a firearm.  (SA-354 (emphasis added).)  Thus, the jury was instructed that it could reach a first-degree murder verdict even if it found that Mr. Czech did not intend to kill Mr. Zuniga or cause him great bodily harm.

The jury returned a general verdict, finding Mr. Czech guilty of first-degree

murder. (A-5.) Mr. Czech was sentenced to 42 years of imprisonment. (SA-367.)

### III.    MR. CZECH'S APPEAL AND HABEAS PROCEEDINGS

Following his conviction, Mr. Czech filed a direct appeal, challenging his murder conviction on a number of grounds. (A-14.) Mr. Czech argued that his trial counsel was ineffective for failing to challenge the felony murder instruction. (*Id.*; *see also* SA-368 – SA-400.) The appellate court agreed that the felony murder instruction was improper under Illinois law, but nevertheless determined that there was no reversible error. (A-14.) The appellate court reasoned that there was a valid presumption that a jury returning a general verdict had decided to convict the defendant of the most serious crime charged, which in this case was intentional or knowing murder. (*Id.*; *see also* SA-386.) Thus, the appellate court reached the conclusion that the trial court's error in instructing the jury with respect to felony murder was harmless because the jury convicted Mr. Czech under the intentional or knowing charge. (SA-386 – SA-387.) The appellate court, moreover, did not hold that a conviction based on a general verdict where the jury was instructed on an invalid legal theory is a federal constitutional error. (*Id.*) As a result, it did not engage in the harmless error review required by *Chapman v. California*, 386 U.S. 18 (1967). Following the conclusion of his appeal, Mr. Czech completed his state post-conviction proceedings without obtaining relief.

Mr. Czech sought a federal writ of habeas corpus, arguing among other things that his state-court appellate counsel was ineffective by not challenging the disqualification of Mr. Czech's trial attorney. (A-1; *see also* Dkt. 1.) The

district court rejected this claim.

Mr. Czech also sought habeas relief on the basis that his murder conviction cannot stand because the jury was instructed that it could properly reach a first-degree murder verdict based solely on the prosecution's felony murder theory. (A-1; *see also* Dkt. 1) Specifically, Mr. Czech argued that his conviction must be set aside under *Stromgberg v. California*, 283 U.S. 359, 367-68 (1931), which held that a general verdict based on alternative grounds must be reversed if any one of those grounds is unconstitutional. The district court concluded that "[t]here [was] no dispute that the jury was instructed on an improper legal theory and returned a general verdict" and that was "constitutional error under" *Yates v. United States*, 354 U.S. 298 (1957). (A-19.) The district court therefore concluded that Mr. Czech had satisfied § 2254(d), but raised the question as to whether such error was harmless. (A-19 – A-20.) Mr. Czech had not previously briefed this issue, and due to its importance, the district court appointed counsel to provide supplemental briefing on this issue. (A-20.)

Following the submission of supplemental briefing on the harmless error issue, the district court concluded that a properly instructed jury would have convicted Mr. Czech of intentional or knowing murder because the evidence of his guilt under that theory of the case was "overwhelming." (A-33 – A-40.) The district court issued a certificate of appealability with respect to whether the trial court's issuance of the invalid felony murder instruction was harmless error. (A-40 – A-41.)

## SUMMARY OF ARGUMENT

The district court erred in denying habeas relief and a new trial to Mr. Czech even though the undisputed due process error resulting from the prosecution's inclusion of an invalid felony murder count may have resulted in Mr. Czech's first-degree murder conviction without the jury finding the required intent.  The district court did not adequately consider the impact the trial court's erroneous felony murder instruction and the prosecution's closing felony murder argument likely had on the jury.

The felony murder instruction gave the jury an easy shortcut to a first-degree murder verdict without the need to wrestle with difficult credibility issues concerning the testimony of Mr. Falls, the prosecution's principal witness against Mr. Czech, who had plea bargained with the prosecution and whose testimony included several significant inconsistencies.   The district court erroneously concluded that the felony murder error was harmless because, in the district court's view, the evidence of Mr. Czech's intent was "overwhelming."   That conclusion is erroneous because the district court gave undue weight to what it termed Mr. Czech's "confessions" which were in fact his statements to the police concerning his involvement in the shooting, but which did not admit either the required intent for first-degree murder or his guilt.  The district court in turn gave no weight to the inconsistencies in Mr. Falls's testimony, which the jury properly could have rejected based on his plea agreement with the prosecution. Nor did the district court consider the significant credibility assessment that the jury was obligated to perform with respect to Detective Healy's testimony

11

concerning the two statements Mr. Czech made to her. Only the second statement was recorded, and it differed considerably from the first unrecorded statement that Detective Healy recounted in her testimony. Performing such an assessment became far less critical in the presence of the improper felony murder instruction, effectively absolving the jury from evaluating the credibility issues presented by Mr. Falls's and Detective Healy's testimony.

The district court's view of the "overwhelming evidence" of Mr. Czech's intent is also contradicted by the priority that the trial court gave to the felony murder theory and the emphasis given to that theory in the prosecution's closing argument. If the prosecution's evidence was so overwhelming, why did the prosecution take such a risk of reversible error by even including, much less focusing the jury's attention on, the felony murder theory at trial? The answer is that the prosecution thought that there was a risk that the jury would not find that Mr. Czech had the required intent for intentional or knowing murder.

The district court's determination that there was "overwhelming evidence" of Mr. Czech's intent to kill or cause great bodily harm deprived Mr. Czech of the right to have a jury determine the credibility of the witnesses who testified against him. It is undeniable that at least one juror, if not all, may have had reasonable doubts about Mr. Czech's intent and took the path of least resistance to a first-degree murder verdict based on the erroneous felony murder instruction. A first-degree murder conviction cannot properly be based on speculation that the jury found that Mr. Czech had the required intent even though the jury was told both by the prosecution and the trial court that it could

12

find Mr. Czech guilty of first-degree murder without finding such intent.

## ARGUMENT

## I. THE DISTRICT COURT ERRED IN DENYING MR. CZECH'S PETITION FOR A WRIT OF HABEAS CORPUS.

### A. The District Court's Conclusion That Mr. Czech's Conviction Based On A General Verdict Did Not Have Substantial And Injurious Effect Is Subject To A De Novo Standard of Review.

As a general matter, appellate courts review a district court's denial or grant of a habeas petition under a *de novo* standard.  *See, e.g.*, *Dassey v. Dittmann*, — F.3d —, 2017 WL 2683893, at * 11 (7th Cir. June 22, 2017) (affirming district court's decision to grant habeas petition under § 2254); *Jones v. Basinger*, 635 F.3d 1030, 1040 (7th Cir. 2011).

On federal habeas review, a constitutional error is considered harmless unless it can be shown to have "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson,* 507 U.S. 619, 622 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776 (1946).  The *Brecht* standard is applied regardless of whether the state appellate court determined that the error was harmless beyond a reasonable doubt under *Chapman v. California,* 386 U.S. 18 (1967). *See Basinger*, 635 F.3d at 1052.  Here, the Illinois Appellate Court did not address the harmless error issue.

Under the *Brecht* standard*,* "if a habeas court has so much as a "'grave doubt as to the harmlessness of a constitutional error, it should grant relief.'" *Basinger*, 635 F.3d at 1052 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 445 (1995)).  "Grave doubt" exists where, "'in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the

error.'" *Sorich v. U.S.*, 709 F.3d 670, 674 (7th Cir. 2013) (quoting *O'Neal*, 513 U.S. at 435). Moreover, "This inquiry does not ask whether the jurors 'were … right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision.'" *Sorich*, 709 F.3d at 674 (quoting *Kotteakos*, 328 U.S. at 764).

The Supreme Court gave further guidance in *O'Neal*:

> As an initial matter, we note that we deliberately phrase the issue in this case in terms of a judge's grave doubt, instead of in terms of "burden of proof." The case before us does not involve a judge who shifts a "burden" to help control the presentation of evidence at a trial, but rather involves a judge who applies a legal standard (harmlessness) to a record that the presentation of evidence is no longer likely to affect. In such a case, we think it conceptually clearer for the judge to ask directly, "Do I, the judge, think that the error substantially influenced the jury's decision?" than for the judge to try to put the same question in terms of proof burdens (e. g., "Do I believe the party has borne its burden of showing . . .?"). As Chief Justice Traynor said:
>
> > "Whether or not counsel are helpful, it is still the responsibility of the . . . court, once it concludes there was error, to determine whether the error affected the judgment. It must do so without benefit of such aids as presumptions or allocated burdens of proof that expedite fact-finding at the trial." R. Traynor, *The Riddle of Harmless Error* 26 (1970).

*O'Neal*, 513 U.S. at 436-37.

The district court determined that "there is no dispute that the jury was instructed on an improper legal theory and returned a general verdict. That is constitutional error." (A-19.) Respondent-Appellee has not appealed that conclusion. Thus, the only question before this Court is whether that error was harmless under the "substantial and injurious effect" standard enunciated in

*Brecht.*  For the reasons discussed below, it was not harmless.  To the contrary, it may well have resulted in Mr. Czech's first-degree murder conviction.

### B.    The District Court Did Not Adequately Consider The Impact The Erroneous Felony Murder Instruction Likely Had On The Jury.

The district court premised its conclusion that the invalid felony murder instruction was harmless error on its view that *Brecht* asks whether a rational jury would have found the defendant guilty based on the record as a whole if it had been properly instructed.  (A-34 – A-37.)  The district court reasoned that *California v. Roy*, 519 U.S. 2 (1996) supported the application of this standard. That approach, however, misinterprets what *Brecht* requires.  Under *Brecht*, the court must review the entire record "in order to determine whether the error *had substantial and injurious effect or influence* in determining the jury's verdict." *Jenkins v. Nelson*, 157 F.3d 485, 494 (7th Cir. 1998) (emphasis added).  Or, as stated above, the *Brecht* standard asks "what effect the error had or reasonably may be taken to have had upon the jury's decision." *Sorich*, 709 F.3d at 674. The Court in *Roy* specifically rejected the standard applied by the Ninth Circuit in that case, which provided that the omission of the element of intent from a jury instruction "is harmless only if review of the facts found by the jury establishes that the jury *necessarily* found the omitted element." *Roy*, 519 U.S. at 4.  The *Roy* Court stated, however, that the proper harmless error standard to be applied was what was "enunciated in *Brecht* and *O'Neal*." *Id.* at 5.  The district court lost sight of *Brecht's* holding that a constitutionally invalid instruction is not harmless if it "influenced" the jury's verdict.  Under the facts here, it is more likely that the felony murder instruction influenced the jury's deliberations than

that the jury ignored the felony murder issue because it found the evidence of Mr. Czech's intent so "overwhelming."

Indeed, in concurring in *Roy*, Justice Scalia (joined by Justice Ginsburg) emphasized that a criminal defendant is constitutionally entitled to a *jury verdict* that he is guilty of the crime, and absent such a verdict the conviction must be reversed, 'no matter how inescapable the findings to support that verdict might be.'" *Id.* at 7 (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993). The concurrence pointed out that in the absence of a formal verdict encompassing each of the necessary elements of the crime "cannot be rendered harmless by the fact that, given the evidence, no reasonable jury would have found otherwise." *Id.* at 7. Rather, in order to determine that the error was harmless, either the jury verdict as issued "effectively embraces" the elements missing from the instruction, or based on the habeas court's review of the entire record, it is impossible for the jury to have reached the verdict without also finding the missing element. *Id.* While Justice Scalia and Justice Ginsburg's point is not a Supreme Court holding, it appears irrefutable. How can a court properly hold a constitutional error harmless if it must speculate on what the jury would have found absent the error? That is what the district court did here.

In this case, the general verdict by its very nature could not have "effectively embrace[d]" the elements of intentional or knowing murder any more than it "embraced" the elements of felony murder—the verdict itself does not reflect any particular findings of the jury. Nor does a review of the entire record reveal that it would be impossible for the jury to reach the verdict it did without

16

also finding that Mr. Czech was guilty for intentional or knowing murder. Rather, a review of the entire record makes it clear that the invalid felony murder instruction "had substantial and injurious effect or influence in determining the jury's verdict." *Jenkins*, 157 F.3d at 494.

This conclusion is borne out by a review of the record, specifically the manner in which the prosecution framed its case for the jury, and the structure of the trial court's instructions to the jury. The State's primary theory at trial was that Mr. Czech was guilty of first-degree murder under the felony murder instruction or, at the very least, that the jury could simply avoid making the more difficult finding of the elements of intentional or knowing murder by bypassing that instruction in favor of the much less demanding and intent-free felony murder instruction. After recounting the series of events leading to Mr. Zuniga's death, the prosecution directly tied the felony of aggravated discharge of a firearm to murder, stating "That ladies and gentlemen is murder, aggravated discharge of a firearm." (SA-308.)

Again, after explaining to the jury that accomplices to the same crime are equally guilty of that crime, the prosecution tied the two charges together, telling the jury, "And your job[,] and this is really what it boils down to[,] I would submit[,] is to determine whether or not [Mr. Czech] is accountable *for the aggravated discharge and first degree murder*." (SA-310.) The emphasis on the predicate felony (aggravated discharge) before the more serious crime of intentional or knowing murder demonstrates that the State placed great weight on the felony murder instruction as opposed to the intentional or knowing

17

murder instruction.  At the very least it suggests that the prosecution was offering the felony murder instruction to the jury as a shortcut to reaching a murder verdict.

More importantly, however, was the prosecution's closing argument encouraging the jury that even if it wanted to give Mr. Czech the *benefit of the doubt* as to whether he or Mr. Falls intended to, or knew that, firing the pistol would cause death or great bodily harm, the jury must still convict under the felony murder theory.  The prosecution admonished the jury

> Even if you're inclined to give this Defendant the benefit of any conceivable doubt to think well he didn't want anybody to get hurt; for some reason feel sorry for him.  Thinking he was just maybe looking to scare somebody; not having [Falls] fire those shots.  *The fourth option on that second prong he was committing the offense of aggravated battery of a discharge [sic].  Even if you think he was out there to commit an aggravate[d] discharge of a firearm, even if you think he was out there for a shooting to scare these guys, that's enough.  That is enough to commit him to be responsible for him to be guilty of murder.*

(SA-317.)  Indeed, the prosecution emphasized that the State did not need to prove intent for the jury to convict Mr. Czech of first-degree murder, stating:

> That to sustain the charge of first degree murder it is not necessary for the State to show that it was or may have been the original intent of the Defendant or one for whose conduct he is legally responsible for killing the deceased [victim].  It is sufficient if the jury believes from the evidence beyond a reasonable doubt that the defendant and one for whose conduct he is legally responsible combined to do an unlawful act such as to commit aggravated discharge of a firearm and the deceased was killed by one of the parties committing the unlawful act.  *Even if you think that he just wanted there to be some shots.  Even if you think he didn't want anybody to get hurt.  Under the law which you've all sworn to follow, that's enough.  That is enough to establish his guilt on the charge of murder.  Under the theory of felony [sic].  That's enough.*  He is guilty.  I submit that should be your verdict.

18

(SA-318.)

Given the testimony at trial, the prosecution's emphasis on the felony murder instruction as a way for the jury to bypass the need to determine whether Mr. Czech's and Mr. Fall's intent likely had a substantial and injurious effect or influence on the jury's decision. *See Sorich*, 709 F.3d at 674 (holding that the "substantial and injurious effect or influence" inquiry enunciated in *Brecht* asks "what effect the error had or reasonably may be taken to have had upon the jury's decision") (internal quotation marks omitted). Considering the weight that the State put on this instruction, and the lack of testimony concerning Mr. Falls's understanding of his conduct, the felony murder instruction should have created "grave doubt" in the district court's mind as to whether the jury would have returned a first-degree murder verdict absent the repeatedly emphasized, and improper, felony murder instruction. Without this instruction, and in the absence of a specific jury finding of the required intent, "it is impossible to say under which clause of the statute the conviction was obtained," which then mandates that the verdict should be set aside. *Stromberg v. California*, 283 U.S. 359, 368 (1931). This is particularly true given that (as discussed below) the testimony and evidence offered at trial is insufficient to eradicate substantial doubts as to whether the jury would have convicted Mr. Czech of first-degree murder on the theory that he directed Mr. Falls to fire the weapon with the intent to do great bodily harm.

The State argued below that the prosecution's statement that felony murder was "even a fourth option," that the jury could employ to convict if they

were "inclined to give [Mr. Czech] the benefit of any conceivable doubt." (Dkt. 32 at 9 (emphasis omitted).)  Likewise, the State argued that the prosecution's "phrasing underscores the unlikelihood that jurors would need to rely on felony murder where knowing and intentional murder had been proven overwhelmingly." (*Id.*) However, the prosecution's repeated reliance on the felony murder instruction undercuts the State's position that the felony murder instruction was a minor component of its theory of the case and prosecution strategy.

Indeed, the State's reliance on its felony murder theory even though it risked reversible error demonstrates the prosecution's concern under the evidence that the jury, or one or more jurors, could have a reasonable doubt about Mr. Czech's intent.  The prosecution saw a weakness in its first-degree murder case and used felony murder to avoid a not-guilty verdict because of insufficient evidence of *mens rea*.  Yet the district court ignored the priority that the trial court gave to the prosecution's felony murder theory in its instructions. The trial court told the jury:

> It is sufficient if the jury believes from the evidence beyond a reasonable doubt that the Defendant and one for whose conduct he is legally responsible combined to do an unlawful act, such as to commit aggravated discharge[] of a firearm and that the deceased was killed by one of the parties committing that unlawful act.

(SA-353 – SA-354.) Again, it was only after it gave the jury this felony murder instruction that the trial court instructed the jury on the elements of intentional or knowing murder.  (*See* SA-354.)

Consequently, the felony murder instruction and argument likely had the

"effect or influence" of diminishing the jury's attention to the fundamental issue of whether the prosecution had proven intent, or had the "effect or influence" of removing this assessment from the jurors' minds altogether, cognizant that the felony murder theory was available. Because the felony murder instruction provided a shortcut, permitting a jury to convict a defendant of first-degree murder without making a finding concerning culpable intent, *see Illinois v. Davison*, 923 N.E.2d 781, 785-86 (Ill. 2010), its erroneous inclusion in Mr. Czech's trial, and the prosecution's heavy reliance on it, suggest that the general verdict reflects that the jury took that shortcut to convict a gang member of murder. Rather than use felony murder as a mere "fallback" (as the district court referred to it) or alternative to intentional or knowing murder, the prosecution emphasized the availability of felony murder to lessen—indeed, eliminate—its burden of proof on intent. This reliance plainly reflected the prosecution's belief that it could "avoid the burden of proving an intentional or knowing first degree murder," *Davison*, 923 N.E.2d at 786, a belief that the jury, as reflected by its issuance of a general verdict, likely adopted. In this manner, the use of the erroneous felony murder instruction, when coupled with the issuance of a general verdict, strongly indicates that the jury's decision was substantially influenced by that error.

The district court ignored the impact that the use of the felony murder instruction likely had on the jury and accordingly misapplied the *Brecht* standard. Where, as here, the erroneous instruction allowed the jury to convict the defendant of *intentional* first-degree murder by issuing a general verdict while

making no finding concerning scienter, a "grave" question is necessarily raised as to whether the error was harmful.

In this case it is impossible to know what the jury, or even one juror, decided with respect to the felony murder charge and scienter.  *See Jensen v. Romanowski*, 590 F.3d 373, 381 (6th Cir. 2009) ("the inclusion of [police officer's] testimony *could have tipped the scale for one juror and thereby injuriously or substantially impacted the final verdict*. Under these circumstances, we cannot be certain that the error had 'no or small effect' on the jury's verdict and should have 'grave doubt' that the error was harmless.") (emphasis added).  Whether a trial occurring without the error would have led a reasonable jury to reach the same verdict—the standard applied by the district court—is not the proper standard. As the *Kotteakos* Court stated, and *Brecht* reiterated, "the inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence."  328 U.S. 750, 765 (1946); *see also Brecht*, 507 U.S. at 637.  Or, put another way, "the inquiry . . . is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) (emphasis in original).  The Supreme Court, as this Circuit has recently noted, has "reinforced this principle over and over."  *Jensen v. Clements*, 800 F.3d 892, 902 (7th Cir. 2015).

And, indeed, *Jensen v. Clements* is instructive here.  There, this Court reviewed the Wisconsin appellate court's conclusion that the admission of an

incriminating letter was harmless error, concluding that the Wisconsin appellate court improperly "conduct[ed] an evaluation of whether there was sufficient evidence to support the verdict, not whether the error in admitting [the letter] … affected the jury's verdict." *Id.* at 903. In that case, Julie Jensen wrote a letter to the police indicating that she would not consider taking her own life and that if she were to die, the police should look to her husband as the suspect. *Id.* at 894-95. Ms. Jensen was later found dead, and Wisconsin brought murder charges against her husband, Mark Jensen. *Id.* at 896. The state introduced the letter as evidence at trial. *Id.* at 895. Mr. Jensen was convicted of murder. *Id.* On direct appeal, the Wisconsin appellate court determined that the admission of the letter was erroneous but harmless under *Chapman v. California*, 386 U.S. 18 (1967). *Jensen*, 800 F.3d at 895. Mr. Jensen filed a habeas petition, arguing that the admission of his late wife's letter violated his Sixth Amendment rights. *Id.* at 898.

The district court, applying the *Brecht* standard, determined that the introduction of the letter was not harmless, and this Court affirmed. *Id.* at 908. This Court performed its harmless error review *de novo*, stating that "harmless-error inquiry is not the same as a review for whether there was sufficient evidence at trial to support a verdict." *Id.* at 902. The *Jensen* court then evaluated the Wisconsin appellate court's decision that the error was harmless, noting specifically that the Wisconsin court summarized compelling evidence, in the Wisconsin court's words, "in order to illustrate that the record is replete with reason to uphold the jury's verdict, even if the assumedly tainted evidence is

disregarded." *Id.* at 903 (quotation marks omitted). The Wisconsin court stated that this was evidence from which "a rational jury could conclude beyond a reasonable doubt" that Mr. Jensen murdered his late wife. *Id.* (quotation marks omitted). In this way, the Wisconsin court's analysis is similar to the district court's analysis here.

However, as this Court emphasized in *Jensen*, that analysis is improper: "But a statement of what a 'rational jury could conclude' is not a statement of a harmless-error inquiry; it is instead the question presented when a direct appeal asks whether there is sufficient evidence to support a verdict." *Id.* This Court noted that the Wisconsin's court's "analysis . . . demonstrates that it [was] conducting a review for whether there is sufficient evidence to support a verdict, a review that looks at all the evidence in the light most favorable to the conviction, and where the inquiry is only whether the jury could have convicted," and rejected that analysis because it "is very different than the harmless error test under clearly established Supreme Court law." *Id* at 903-04 (internal citation omitted).

Undertaking its own harmless error analysis, the *Jensen* court noted that the erroneously admitted letter played a significant role in the state's prosecution of the case from the beginning. *Id.* at 904. The letter was a key component of the state's opening argument and was also integral to its closing argument, facts that the *Jensen* court highlighted, noting that "[t]he letter was also the last thing the State left in the jury's mind before it deliberated Jensen's fate" and that the "importance of the letter in the State's case was emphasized over and over by the State." *Id.* at 904-05. Applying the proper *Brecht* standard, the *Jensen* court

24

concluded that "the improperly admitted letter and accusatory statements resulted in actual prejudice to Jensen." *Id.* at 908. Accordingly, it affirmed the district court's decision to grant habeas relief.

The district court's improper application of the *Brecht* standard here parallels the Wisconsin appellate court's misapplication of the harmless error standard in *Jensen* in that both courts focused their analysis on what a rational jury "could" conclude as opposed to whether the constitutional error at trial had an actual substantial and injurious effect or influence on the jury's decision. The letter in *Jensen*, which the prosecution invoked repeatedly in its jury argument and, as this Court acknowledged, plainly influenced the jury's decision, even though it was only one component of the prosecution's case. Here, too, the inclusion of the invalid felony murder instruction was only one component of the prosecution's case. However, as explained above, it was plainly relied on by the State to bypass the higher and more difficult showing of intentional or knowing murder.

The State's repetition of the elements of felony murder, and its admonishment to the jury in its closing—"Even if you think that he just wanted there to be some shots. Even if you think he didn't want anybody to get hurt. . . That is enough to establish his guilt on the charge of murder. Under the theory of felony [sic]. That's enough. He is guilty"—reflect that the State encouraged the jurors to use the felony murder instruction so that there was no need to find that Mr. Czech engaged in an intentional or knowing murder. And just as the prosecution's repeated reliance on the letter in *Jensen* influenced the jury's

25

verdict, the State's reliance here on felony murder here unquestionably influenced the jury's verdict.  In neither case was the prosecution's case a "slam dunk," *id.* at 906, and in both cases there is, at least, "grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict."  *Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015) (quoting *O'Neal*, 513 U.S. at 436).

However, even if the district court had applied the proper harmless error standard—which it did not—a review of the complete record does not establish that there was "overwhelming" evidence of Mr. Czech's guilt of intentional or knowing murder.

### C.    The District Court Erroneously Concluded That The Evidence Of Mr. Czech's Guilt Was Overwhelming.

Reviewing the entire trial record demonstrates that it does not "overwhelmingly establish" that Mr. Czech directed Mr. Falls to discharge a firearm with the required intent for first-degree murder.  As discussed above, the State began its closing argument by highlighting the lesser offence of aggravated discharge of a firearm, and the trial court similarly gave priority to felony murder in its instructions.  (SA-313, SA-354 – SA-355.)  It is not disputed that the record supports such a conviction with respect to Mr. Falls—Mr. Falls and Ms. Malave both testified that Mr. Falls retrieved a weapon on his own volition, reached out the window of Mr. Mejia's car, and fired five shots in the direction of Latin Kings gang members.  However, the record evidence does not "overwhelmingly" establish that Mr. Czech was legally responsible for Mr. Falls's conduct, or that he was responsible for directing Mr. Falls to either retrieve the weapon or fire the

shots.

For instance, Mr. Falls testified that he was directed by Mr. Czech to retrieve the pistol used in the shooting, while Ms. Malave testified that Mr. Falls alone directed Mr. Mejia to drive the car to the location where the pistol was stored, and that Mr. Falls retrieved it himself. (SA-74 – SA-76.) This conflicting testimony undermines the "overall strength of the prosecution's case." *See Jensen*, 800 F.3d at 906.

Likewise, Mr. Falls's and Ms. Malave's testimony with respect to who made the decision to shoot at the Latin Kings gang members is inconsistent, and again undermines the overall strength of the State's case. Mr. Falls testified that Mr. Czech directed him to shoot at the Latin Kings, but Ms. Malave testified that she could not recall any such plan. (*Compare* SA-123 – SA-125 *with* SA-100 – SA-101.) Indeed, Ms. Malave testified only that Mr. Czech had suggested that the group "go cruise by the Kings" and that he said nothing further about "going by the Kings." (SA-91) These inconsistencies go to the central premise on which the district court focused, specifically that the evidence of Mr. Czech's guilt under an intentional or knowing theory of murder was "overwhelming."

The district court also ignored the credibility determinations that the jury was required to make in determining whether Mr. Czech had the requisite scienter. Mr. Falls was the principal witness against Mr. Czech, and Mr. Falls had plea-bargained with the prosecution to enter a guilty plea as a juvenile. Given the inconsistencies in Mr. Falls's testimony, a reasonable jury could have been reluctant to find, based on Mr. Falls's testimony, that Mr. Czech intended

to kill or cause great bodily harm.  Similarly, Detective Healy offered the only testimony (and, indeed, the only evidence) concerning Mr. Czech's first statement.  Her testimony about the content of Mr. Czech's first statement differed from the content of his second, taped statement, in which, to quote Detective Healy, Mr. Czech's involvement in the shooting was "minimized."  By ignoring the jury's responsibility to evaluate witness credibility, particularly on facts where the testimony of Mr. Falls and Detective Healy was crucial to the State's case, the district court erred.  *See Blackston v. Rapelje*, 780 F.3d 340, 357 (6th Cir. 2015) ("[T]he question of witness credibility is the most fundamental issue that a jury resolves.  It is quintessential material for the jury and, plainly, not within the province of the judge.") (applying *Brecht* in finding that error was not harmless).

The trial record accordingly leaves considerable doubt as to whose idea it was to fire the shots, or what the intended outcome of that conduct was.  Mr. Falls's testimony was not consistent on several issues, and his testimony minimizing his culpability and maximizing Mr. Czech's culpability was itself contradicted by Ms. Malave's testimony.  It is thus not clear that Mr. Falls took any action for which Mr. Czech would be legally responsible as opposed to Mr. Falls being wholly responsible.  Yet, reading the district court's opinion, there is little discussion of the facts presented to the jury that undermined the strength of the State's case, particularly its case with respect to intentional or knowing murder.  Again, these inconsistencies and credibility issues reveal that the strength of the State's case with respect to intentional or knowing murder was

not, as the district court described it, "overwhelming."[6]

To support its view that the trial evidence was overwhelming on the issue of Mr. Czech's scienter, the district court repeatedly cited Mr. Czech's "confessions." (*See* A-4, A-27 – A-28.) The statements (only one of which was recorded) to which the district referred were not confessions. They were, by Detective Healy's testimony, inconsistent statements made to the police concerning Mr. Czech's involvement in the shooting. (SA-233.) At no point in these statements did Mr. Czech state that he was responsible for Mr. Zuniga's death. Indeed, his first purported statement was not recorded and was only recounted by Detective Healy's testimony. (SA-224 – SA-230.) And in his second statement Mr. Czech denied responsibility for what Mr. Falls had done. (SA-241 – SA-243.) Once again, at most Mr. Czech's statements to the police raised credibility issues, both with respect to Mr. Falls and Detective Healy, which the jury had to resolve. To avoid the need to decide those credibility issues, it is likely that the jury resorted to the prosecution's felony murder theory. Thus, contrary to the district court's conclusion, Mr. Czech's statements do not show that the trial evidence was "overwhelming" with respect to his intent.

Similarly, the felony murder theory allowed the jury to avoid addressing any credibility issues presented by the testimony of Detective Healy. Detective Healy testified that in his first (unrecorded) statement, Mr. Czech detailed his

---

[6] The district court reasoned that Mr. Czech "showed his intent to murder the Latin Kings when he shouted "King Killer" and "Maniac Love" from the car during the shooting. (A-35.) It is not clear from the record evidence if it was Mr. Czech or another passenger that shouted from the car during the shooting, but even if it was Mr. Czech, this evidence does not establish Mr. Czech's scienter.

involvement in such a way that it largely tracked the testimony of Mr. Falls.  But Detective Healy testified that, in the videotaped statement that she took from Mr. Czech later that same night, Mr. Czech "minimized his involvement in the homicide." (SA-233.)  Thus, the jury was permitted, by way of the felony murder instruction, to dismiss concerns about the credibility of Detective Healy, whose testimony concerning Mr. Czech's first purported statement was, by her own admission, inconsistent with the recorded statement he provided later that same night.  Because the jury was presented only with Detective Healy's testimony concerning the first statement and the videotaped statement of Mr. Czech (which was not transcribed by the court reporter when it was played at trial), it was up to the jury to perform the critical assessment of Detective Healy's and Mr. Czech's credibility in her testimony and his videotaped statement, respectively. Importantly, this assessment could not be performed by the district court after the fact.

Accordingly, given the likely effect on the jury of the admittedly erroneous felony murder instruction and the conflicting evidence with respect to the circumstances leading to and surrounding the shooting, the jury's return of a general verdict here was not harmless error.  *See O'Neal*, 513 U.S. at 435 ("the uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict"); *cf. Statler v. Garcia*, 78 Fed. Appx. 22 (9th Cir. 2003) (habeas relief granted based on erroneous felony murder instruction that was not harmless error). The weakness of the State's evidence of Mr. Czech's scienter and the substantial credibility issues arising from Mr. Falls's inconsistent

testimony, as well as Ms. Malave's contradictory testimony, establish at the very least a basis for grave doubt as to whether the jury's decision was materially influenced by the erroneous felony murder instruction.  Thus, even if the district court's "overwhelming evidence" standard was proper—again, it was not—there remains grave doubt whether reliance on the felony murder instruction led the jury to convict Mr. Czech of first-degree murder.  Under this standard, the error was not harmless.

The proper and fair recourse is to submit the evidence of Mr. Czech's guilt of intentional or knowing murder to a jury that can make factual determinations without being influenced by impermissible felony murder instructions and arguments.

## CONCLUSION

For the foregoing reasons, Mr. Czech respectfully requests that this Court reverse the district court's order denying Mr. Czech's petition for a writ of habeas corpus and direct the district court on remand to vacate Mr. Czech's conviction.

Dated: July 13, 2017                    Respectfully submitted,

KEVIN CZECH,

By: /s/James T. Malysiak
    James T. Malysiak

jmalysiak@jenner.com
Aaron J. Hersh
ahersh@jenner.com
JENNER & BLOCK, LLP
353 North Clark Street
Chicago, Illinois 60654-3456
(312) 222-9350

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(c) because this brief contains 8,990 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32 and the type style requirements of Fed. R. App. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2013 in 12 point Bookman Old Style font for the main text and footnotes.

Dated: July 13, 2017                              /s/ James T. Malysiak
                                                          James T. Malysiak

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), I, James T, Malysiak, an attorney, certify that all material required by Circuit Rule 30(a) and (b) are included in Plaintiff's Required Short Appendix and Separate Appendix, respectively.

Dated: July 13, 2017                    /s/ James T. Malysiak
                                         James T. Malysiak

**CERTIFICATE OF SERVICE**

I, James T. Malysiak, an attorney, hereby certify that on July 13, 2017, I caused the foregoing **Brief And Required Short Appendix Of Petitioner-Appellant Kevin Czech** and **Separate Appendix** to be electronically filed with the Clerk of the Court for the United States Court Of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Pursuant to ECF procedure (h)(2) and Circuit Rule 31(b), and upon notice of this court's acceptance of the electronic brief for filing, I certify that I will cause 15 copies of the **Brief And Required Short Appendix Of Petitioner-Appellant Kevin Czech** and 10 copies of the **Separate Appendix** to be transmitted to the court via hand delivery within five days of that date.

Erin O'Connell,
Office Of The Attorney General
100 W. Randolph Street
State of Illinois Center
Chicago, IL 60601-3218
eoconnell@atg.state.il.us

Chief of Criminal Appeals
Office Of The Attorney General
100 West Randolph Street
State of Illinois Center
Chicago, IL 60601-3218
ndilecf@atg.state.il.us

/s/ James T. Malysiak
James T. Malysiak

**INDEX OF REQUIRED SHORT APPENDIX OF
PETITIONER-APPELLANT KEVIN CZECH**

Memorandum Opinion and Order,
    August 3, 2016 (Dkt. 17).......................................................................A-1

Memorandum Opinion and Order,
    March 24, 2017 (Dkt. 34)....................................................................A-24

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS**

Kevin Czech, (K90539),        )
                               )
              Petitioner,     )
                               )     Case No. 14 C 2012
        v.                )
                               )     Judge Robert W. Gettleman
                               )
Randy Pfister,             )
                               )
             Respondent.    )

**<u>MEMORANDUM OPINION AND ORDER</u>**

Petitioner Kevin Czech, a prisoner at the Pontiac Correctional Center, brings this *pro se* habeas corpus petition pursuant to 28 U.S.C. § 2254 challenging his murder and unlawful possession of a firearm convictions from the Circuit Court of Cook County. Petitioner argues: (1) appellate counsel was ineffective for failing to argue on appeal that the trial court denied his Sixth Amendment right to counsel of his choice; (2) his due process rights were violated when the jury instructions included an invalid type of murder offense and the jury returned a general verdict; and, (3) ineffective assistance of trial counsel for: (a) failing to request various jury instructions, and (b) failing to prevent the jury from learning that the shooter had been convicted of murder.

For the reasons discussed below, the court rejects petitioner's ineffective assistance of counsel arguments (Claims One and Three), but instructs the parties to provide additional briefing regarding the due process issue (Claim Two). The court concludes that there was a due process violation at petitioner's trial, but believes additional briefing is required as to whether this error had a "substantial and injurious effect or influence" on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1995). Consequently, the court recruits Kenneth A. Kroot, Jenner & Block

LLP, 353 N. Clark Street, Chicago, IL 60657, to represent petitioner pursuant to counsel's trial bar

obligation under Local Rule 83.11(g).

## A.    Background

The following facts are drawn from the Illinois Appellate Court's opinion on direct appeal.

*Illinois v. Czech*, No. 1-02-0982 (Ill. App. Ct. Mar. 31, 2004) (Rule 23 Order).[1]   The state court

findings are presumed correct, and petitioner has the burden of rebutting the presumption of

correctness by clear and convincing evidence.   *Brumfield v. Cain*, 135 S. Ct. 2269, 2282 n.8

(2015) (citing 28 U.S.C. 2254(e)(1)).   Petitioner provides no evidence to rebut the state court

findings.

Petitioner was convicted of orchestrating a gang related drive-by shooting in the Avondale

neighborhood on the Northwest side of Chicago.   The shooting occurred at approximately 8:00

p.m. on September 24, 1999.   [10-4 at 43].   The victim, 14-year-old Alonzo Zuniga, was an

innocent bystander, unrelated to a gang.   *Id* at 43-44.   The shooting occurred in an area claimed

by the Latin Kings street gang.   *Id*. at 44.   Petitioner was a member of the Maniac Latin Disciples

street gang, a rival of the Latin Kings.

Petitioner was with Roberto Mejia, Marquis Falls, and Nancy Malaves in a grey Buick

LaSabre when the shooting occurred.   *Id*. at 46.   Malaves, who was then 15, was dating Mejia, 18

years old.   *Id*.   Petitioner was 20 years old, and Falls was 13.   *Id*. at 48.

---

1 The state appellate court opinion on direct appeal provided by respondent is missing the final 13
pages.   Respondent cites to the full state court opinion in his answer without any discussion of the
missing 13 pages.   This suggests that the missing pages of the state court opinion in Exhibit B
were omitted due to a clerical error.   Fortunately, the full state court opinion is included as an
attachment to the postconviction petition that was included in the record.   [10-4 at 42-74].   The
court has used this full copy of the state court opinion.

According to Malaves, the original plan for the evening was for her and Mejia to have a double date at the movies with petitioner and petitioner's girlfriend. *Id*. at 46. Malaves and Mejia picked up petitioner, who informed them that they would "cruise by the Kings," instead of going to the movies. *Id*. Petitioner also instructed that they should pick up Falls. *Id*. After getting Falls, petitioner again said they would go "cruising by some Kings." *Id*.

Falls was a "pee wee" in the Maniac Latin Disciples because, at age 13, he was too young to be a full member. *Id*. at 48. As a "pee wee," Falls could earn his "stars" by performing tasks for older members such as holding guns for them. *Id*. A month before the shooting, petitioner gave Falls a .357 revolver to hold for the gang. *Id*. Falls kept the gun hidden in an alley behind a garbage can, and would check on the gun daily. *Id*.

On the evening of the murder, petitioner, Mejia, and Malaves drove Falls to the alley to retrieve the gun. *Id*. After Falls returned to the car with the gun, Mejia was driving, Malaves was in the front passenger seat, and petitioner and Falls were in the backseat. Petitioner told Falls that either he or Falls would shoot at the Latin Kings. *Id*. at 48-49. If the Latin Kings were on petitioner's side of the car, petitioner would do the shooting, while Falls would be the triggerman if the Latin Kings were on his side. *Id*. at 49. Petitioner also instructed Falls to switch seats with Malaves and sit in the front passenger seat because the rear window did not fully roll down on Falls' side of the car. *Id*.

The group then drove to the area where the Latin Kings were located. A group of approximately 15 people, including the victim Zuniga, were standing on the sidewalk on the passenger (Falls's) side of the car. *Id*. at 44. Petitioner said, "King love" to the group and began

3

making Latin King gang signs with his hands. *Id.* The group of men shouted back "King love," and returned the gang signs. *Id.*

The car drove around the block and went past the group of men for a second time. This time, petitioner told Malave to "close [her] ears, she [was] gonna hear something loud." *Id.* At the same time, petitioner handed the gun to Falls and instructed him to shoot at the group of Latin Kings. *Id.* Falls fired five shots out of the car window. *Id.* One of the bullets killed Zuniga.

Four days after the shooting, the police arrested a different man, Daniel Garcia, for the shooting. *Id.* at 49. Garcia, who knew petitioner and the others involved, told the police that he had heard petitioner admit to his involvement in the shootings. *Id.* Garcia's information led the police to bring petitioner, Mejia, Malaves, and Falls in for questioning. Petitioner confessed to the shooting in a statement to the police, and in a videotaped statement made to an Assistant State's Attorney ("ASA"). *Id.* at 51.[2]

Both Falls and Malaves testified on behalf of the prosecution at trial. The jury was informed that Falls was tried as a juvenile, and found guilty of first degree murder for his participation in the murder. *Id.* at 43. The jury also heard from Gina Phee and Carlos Diaz. Phee and Diaz were standing with the group on the sidewalk during the drive by shooting. *Id.* at 43-45.

---

2 Chicago Police Department Detective Barbara Healy, who obtained petitioner's first oral confession, related the confession during her in-court testimony. It appears that Detective Healy did not attempt to record the first confession. Following petitioner's first confession, a second confession, which was tape-recorded, was obtained by an ASA. The tape-recorded confession was played for the jury, but it was not transcribed in the trial transcripts. The state opinion on direct appeal states that the video tape of the second confession was part of the record on appeal. However, respondent did not file a copy of the video in the present habeas corpus record. Regardless, the state appellate court opinion states that petitioner confessed to the detective, and a second time in a recorded videotape statement given to the ASA. Petitioner does not challenge these facts or otherwise attempt to challenge the presumption of correctness of these findings.

4

At the completion of the trial, the jury found petitioner guilty.   He was sentenced to 42 years of imprisonment.   Petitioner completed his direct appeal, and postconviction proceedings in the Illinois state courts.   He now proceeds with a habeas corpus petition in this court.

**B.     Petitioner's Claims**

> **1.     Claim One:   Ineffective Assistance of Appellate Counsel for Failing to Raise a Claim Regarding Disqualification of Trial Attorney, William Murphy**

Petitioner argues that the state court violated his constitutional right to counsel of his choice when it disqualified his trial attorney, William Murphy.   He concedes the disqualification issue was not raised on direct appeal, but argues that his appellate counsel was ineffective for failing to raise the issue on direct appeal.   Petitioner further concedes that he failed to properly preserve the ineffective assistance of counsel claim in his postconviction proceeding, but blames this second default on ineffective assistance of his postconviction trial counsel.

As to the underlying facts, petitioner's parents retained Murphy and a second attorney, Michael Bianucci, to represent petitioner prior at trial.   *Illinois v. Czech*, No. 1-11-2910, 2013 WL 1227120, at *1 (Ill. App. Ct. Mar. 26, 2013).[3]   Murphy was also representing Daniel Garcia in an unrelated matter.   *Id*.   Garcia was initially a suspect in the shootings before Garcia identified petitioner and his associates to the police.   Murphy also advised Garcia regarding petitioner's case.   Murphy told Garcia to "take the Fifth Amendment and see what the state would do to help him" if called to testify in petitioner's case.   *Id*.   Murphy did not intend to question Garcia, instead having Bianucci examine Garcia at trial.   *Id*.

---

3 The transcript of the pretrial proceedings are not included in the record.   The court has relied upon the state appellate court's statement of facts.   Petitioner does not suggest that the state court's statement of facts are inaccurate.

The trial court explored the conflict prior to petitioner's case going to trial.    Both Murphy
and petitioner were willing to waive the conflict.    *Id*.    However, the trial court found a "*per se*
conflict" that could not be waived and disqualified Murphy from representing petitioner.    *Id*.
With Murphy disqualified, petitioner proceeded with his other attorney, Bianucci, representing
him through trial.

Garcia testified as a prosecution witness at trial.    [10-2 at 19].    He said that petitioner
confessed to the shooting to him the day after it occurred.    [*Id*. at 33].

Following his conviction, petitioner was represented by a Cook County assistant public
defender for his direct appeal.    The appellate attorney did not raise the issue of Murphy's
disqualification.    [10-2 at 198-245].

Petitioner retained new attorneys from the law firm of Kathleen T. Zellner & Associates for
his postconviction proceedings.    The original counseled postconviction petition raised, among
other claims, that petitioner's constitutional right to the counsel of his choice was violated by
Murphy's disqualification.    [10-4 at 40].

Petitioner later supplemented the postconviction petition arguing that the appellate counsel
on direct appeal was ineffective for failing to raise a different issue --- that Bianucci suffered from
the same conflict of interest as Murphy.    [10-4 at 28-36].    Bianucci was allegedly a member of
the same firm as Murphy.    Postconviction counsel argued that Murphy's conflict was imputed to
Bianucci, and that the appellate attorney was ineffective for failing to raise this issue on direct
appeal.    *Id*.

The postconviction petition proceeded to a hearing.    At the beginning of the hearing,
petitioner's counsel explained that he had concluded that it was best to pursue only the imputed

6

conflict of interest claim, and explicitly abandoned the denial of counsel of choice issue.   [10-6 at
2-3].   Following the hearing, the trial court denied the conflict of interest claim, holding that
Murphy and Bianucci were not members of the same law firm.   [10-6 at 146].   The state trial
court concluded that they were independent lawyers in a multi-unit professional complex, meaning
that Murphy's conflict could not be imputed to Bianucci.   *Id*.

On postconviction appeal, petitioner was represented by new attorneys, the Office of the
State Appellate Defender.   Petitioner's postconviction attorneys once again shifted course by
arguing that his postconviction trial attorneys were ineffective in failing to argue that appellate
counsel on direct appeal was ineffective for failing to argue that the trial court denied petitioner his
right to counsel of his choice.   The appellate court rejected the claim, explaining that it would not
reach the counsel of choice issue because there is no right to effective assistance of trial counsel in
a postconviction proceeding when, as in this case, postconviction counsel is privately retained.
[10-7 at 32].   Petitioner's petition for leave to appeal was denied by the Illinois Supreme Court,
ending his postconviction proceedings.   *Illinois v. Czech*, No. 116028, 996 N.E.2d 18 (Ill. Sept.
25, 2013) (Table).

As previously mentioned, petitioner's present claim is ineffective assistance of appellate
counsel on direct appeal for failing to argue that the trial court denied him his Sixth Amendment
right to counsel of his choice.   Respondent argues, and petitioner concedes, that the claim is
procedurally defaulted because it was not properly preserved in the state courts.   Petitioner
counters that his postconviction attorney's failure to properly preserve the claim should excuse the
default.

To exhaust the claim, petitioner had to fairly present the claim before each and every level of the state courts, including through a petition for leave to appeal in the Supreme Court of Illinois. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Lewis v. Sternes*, 390 F.3d 1019, 1025-26 (7th Cir. 2004). Petitioner did mention the denial of his choice of counsel claim in his original postconviction petition in the state court, but his retained postconviction counsel abandoned the claim. The state appellate court on postconviction review also refused to reach the choice of counsel claim when it was reasserted on appeal because it would not excuse the alleged default by postconviction counsel. As petitioner concedes, the record demonstrates that petitioner defaulted his choice of counsel claim.[4]

Petitioner must excuse the default under either cause and prejudice, or fundamental miscarriage of justice. Regarding cause and prejudice, cause is an "'objective factor, external to [petitioner] that impeded his efforts to raise the claim in an earlier proceeding.'" *Weddington v. Zatecky*, 721 F.3d 456, 465 (7th Cir. 2013) (quoting *Smith v. McKee*, 596 F.3d 374, 382 (7th Cir. 2010)). Examples of cause include: (1) interference by officials making compliance impractical;

---

4 The fact that petitioner raised other unrelated ineffective assistance of counsel arguments on direct appeal and in his postconviction proceeding does not satisfy the exhaustion requirement for this claim. Although ineffective assistance of counsel is a single claim, *Pole v. Randolph*, 570 F.3d 922, 934 (7th Cir. 2009) (citing *Peoples v. United States*, 403 F.3d 844, 848 (7th Cir. 2005)), petitioner must raise the particular factual basis for each aspect of the alleged ineffective assistance of counsel to preserve the respective argument. *Pole*, 570 F.3d at 935 (citing *Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007)). "A bare mention of ineffective assistance of counsel is not sufficient to avoid a procedural default; [petitioner] must have 'identified the specific acts or omissions of counsel that form the basis for [his] claim of ineffective assistance.'" *Johnson v. Hulett*, 574 F.3d 428, 432 (7th Cir. 2009) (quoting *Momient-El v. DeTella*, 118 F.3d 535, 541 (7th Cir. 1997)). "Furthermore, petitioner cannot argue one theory [of ineffective assistance of counsel] to the state courts and another theory, based on different facts, to the federal court." *Johnson*, 574 F.3d at 432 (citing *Everett v. Barnett*, 162 F.3d 498, 502 (7th Cir. 1998)).

(2) the factual or legal basis was not reasonably available to counsel;[5] or (3) ineffective assistance of counsel. *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007) (citing *McCleskey v. Zant*, 499 U.S. 467 (1991)). Petitioner raises the third ground by arguing ineffective assistance of postconviction counsel under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012).

The general rule is there is no constitutional right to effective assistance of counsel in a postconviction proceeding, and therefore ineffective assistance by postconviction counsel cannot excuse a procedural default. *Coleman v. Thompson*, 501 U.S. 722, 757 (1991); *Howard v. O'Sullivan*, 185 F.3d 721, 725 (7th Cir. 1999). There is, however, a narrow exception to this general rule.

Under *Martinez*, and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), "'a procedural default will not bar a federal habeas corpus court from hearing a substantial claim of ineffective assistance at

---

5 Petitioner does not attempt to excuse the procedural default by arguing that the legal basis of the claim was unavailable to appellate counsel on direct appeal. *See Reed v. Ross*, 468 U.S. 1, 16 (1984) ("[W]here a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable state procedures."); *McKinley v. Butler*, 809 F.3d 908, 912 (7th Cir. 2016). Because this argument is not raised, petitioner has forfeited it. *United States ex rel. Bell v. Pierson*, 267 F.3d 544, 555 n.6 (7th Cir. 2001).

Beyond the forfeiture, the question of whether the legal basis of the claim was available to appellate counsel is relevant because petitioner cites to *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006), in support of his claim. *Gonzalez-Lopez* holds that the denial of the right to choice of counsel is a structural error. *Gonzalez-Lopez* was decided a year and half after the completion of petitioner's direct appeal. *Illinois v. Czech*, No. 98463, 823 N.E.2d 970 (Ill. Oct. 6, 2014) (Table) Because alleged ineffective assistance of appellate counsel occurred on direct appeal, *Gonzalez-Lopez* was not decided when the alleged ineffectiveness occurred.

However, petitioner's claim is not that his appellate attorney was ineffective for not raising the structural issue. Instead, his claim is ineffective assistance for failing to raise the disqualification of his attorney resulting in the denial of the counsel of his choice. The legal basis of this claim was available to petitioner's appellate attorney when his direct appeal was pending. *Wheat v. United States*, 486 U.S. 153, 159 (1988) (discussing constitutional right to choice of counsel).

9

trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.'"  *Trevino*, 133 S. Ct. at 1921 (quoting *Martinez*, 132 S. Ct. at 1320). Presently *Martinez*, *Trevino*, and a third case, *Maples v. Thomas*, 132 S. Ct. 912 (2012), are the only cases from the Supreme Court where ineffective assistance of postconviction counsel has excused the default of an underlying claim.  However, all three cases involved the default of an underlying claim of ineffective assistance of trial counsel.  The Supreme Court has never held that ineffective assistance of postconviction counsel can excuse the procedural default of an underlying ineffective assistance of appellate counsel claim.

Petitioner argues that *Martinez* should be expanded to his situation of procedural default of an ineffective assistance of appellate counsel claim.[6]  Although neither the Supreme Court nor the Seventh Circuit has directly decided the question of whether *Martinez* can be expanded to cover an underlying ineffective assistance of appellate counsel claim, the court concludes that it must reject petitioner's argument to extend *Martinez*.

The Supreme Court emphasized that the exception recognized in *Martinez* is a "limited exception," and applies only to a default that occurs in the "first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial."  *Martinez*, 132 S. Ct. at 1320. Although the Seventh Circuit has not ruled on the issue, the majority of Circuits have concluded

---

6 The Supreme Court has not addressed whether *Edwards v. Carpenter*, 529 U.S. 446 (2000), applies to *Martinez*.  *Edwards* holds that an ineffective assistance of counsel claim used to excuse the procedural default of an underlying claim is itself a claim that can be procedurally defaulted. 529 U.S. at 453.  The ineffective assistance of counsel claim must be properly exhausted before the state courts to qualify as a cause to excuse a procedural default.  The court does not need to consider whether *Edwards* is applicable to the *Martinez* situation because petitioner complied with *Edwards* by raising the ineffective assistance of postconviction counsel in his appeal and petition for leave to appeal on postconviction review.

10

that the *Martinez* exception to *Coleman* cannot be extended to excuse defaults for claims other than ineffective assistance of trial counsel.   *Reed v. Stephens*, 739 F.3d 753, 778 n.16 (5th Cir. 2014); *Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013); *Dansby v. Hobbs*, 766 F.3d 809, 833 (8th Cir. 2014); *Banks v. Workman*, 692 F.3d 1133, 1148 (10th Cir. 2012).[7]   The Sixth Circuit's decision in *Hodges v. Colson*, a leading case for this position, explains: "The [Supreme] Court in *Martinez* purported to craft a narrow exception to *Coleman*. We will assume that the Supreme Court meant exactly what it wrote: '*Coleman* held that an attorney's negligence in a postconviction proceeding does not establish cause, and this remains true except as to initial-review collateral proceedings for claims of ineffective assistance of counsel at trial.'"   727 F.3d at 531 (citing quoting 132 S. Ct. at 1316). Only the Ninth Circuit has gone the other way, holding that *Martinez* can be applied to excuse a procedural default of an ineffective assistance of appellate counsel claim.   *Ha Van Nguyen v. Curry*, 736 F.3d 1287, 1293 (9th Cir. 2013).   This court agrees that *Martinez* does not apply to this case.

The Supreme Court instructs that the lower federal courts must apply its rulings (in this case, *Coleman*), even when a subsequent Supreme Court ruling (*Martinez*) has narrowed the first case's rationale.   "If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower federal court] should follow the case

---

7  In *Nash v. Hepp*, 740 F.3d 1075, 1079 (7th Cir. 2014), the Seventh Circuit explained that the *Martinez* rule is limited to excuse a defaulted underlying claim of ineffective assistance of trial counsel, but *Nash* did not consider whether *Martinez* could be extended to other situations such as a defaulted ineffective assistance of appellate counsel claim as petitioner argues.

In *Long v. Butler*, 809 F.3d 299 (7th Cir. 2015), *vacated and reh'g en banc granted*, No 13-3327, 2016 WL 1621711 (7th Cir. Apr. 20, 2016), the Seventh Circuit rejected the argument petitioner is making and joined the majority of Circuits holding that *Martinez* could not be applied in a situation of procedurally defaulted ineffective assistance of appellate counsel claim.   However, the panel opinion in *Long* was vacated and *en banc* argument was ordered on an unrelated matter.

which directly controls, leaving to this court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Exp., Inc.*, 490 U.S. 477, 484 (1989).

This court must follow *Coleman* until the Supreme Court instructs otherwise, and expanding *Martinez* to a new situation as petitioner argues would have the improper effect of reducing *Coleman* beyond *Martinez's* narrow exception. Only the Supreme Court can hold that *Coleman* no longer controls the present situation of a defaulted ineffective assistance of appellate counsel claim. *See Gore v. Crews*, 720 F.3d 811, 817 (11th Cir. 2013) (per curiam) ("Unless and until the Supreme Court overrules the limitations it placed on its *Martinez* decision, we are bound to respect and apply them.").

Two additional points to address before proceeding. First, petitioner argues that *Martinez* applies because the underlying claim of denial of his constitutional right to counsel of his choice involves his Sixth Amendment right. However, as explained above, the Supreme Court applied *Martinez* only to a defaulted claim of ineffective assistance of trial counsel, and this court has no authority to extend *Martinez* beyond that claim. The Supreme Court has not applied *Martinez* to any other Sixth Amendment claims.

Second, petitioner points out that the Supreme Court in *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006), held that the wrongful denial of choice of counsel is a structural error. But this does not help petitioner. All errors, including structural errors, must still be properly preserved in the state courts to avoid procedural defaulted. *Ward v. Hinsley*, 377 F.3d 719, 725 (7th Cir. 2004) (citing *Coleman*, 501 U.S. at 750; *Hatcher v. Hopkins*, 256 F.3d 761, 764 (8th Cir. 2001)). Additionally, the claim at issue is ineffective assistance of appellate counsel, which is not a structural error claim.

12

In sum, *Martinez* does not apply to petitioner's claim. He cannot demonstrate cause and prejudice to excuse his procedural default.

This leaves petitioner with the fundamental miscarriage of justice (actual innocence) gateway to excuse his default. To show actual innocence to defeat a default, petitioner must demonstrate that "'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggins v. Perkins*, 133 S. Ct. 1924, 1928 (2013) (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). This is a "demanding" and "seldom met" standard. *McQuiggins*, 133 S. Ct. at 1928 (citing *House v. Bell*, 547 U.S. 518, 538 (2006)). Petitioner must present new, reliable evidence that was not presented at trial --- such as exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence --- to make a credible claim of actual innocence. *House*, 547 U.S. at 537 (citing *Schlup*, 513 U.S. at 324); *see McDonald v. Lemke*, 737 F.3d 476, 483-84 (7th Cir. 2013) (quoting *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) ("[A]dequate evidence is 'documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who places him out of the city, with credit card slips, photographs, and phone logs to back up the claim.'")).

Petitioner presents no new evidence to suggest he is actually innocent. Malave and Falls testified that petitioner orchestrated the shooting, and Garcia testified that petitioner confessed to him after the shooting. Petitioner also confessed to the police. The fundamental miscarriage of justice exception does not apply. The claim is procedurally defaulted and petitioner cannot excuse the default. Claim One is denied.

### 2.    Claim Two:   Use of General Verdict

Petitioner next argues that his murder conviction cannot stand because the jury was instructed on an impermissible felony murder theory.   The trial court instructed the jury on the elements of Illinois's murder statute.   720 ILCS 5/9-1.   The jury was told it should find petitioner guilty of murder if he: (1) intended to kill the victim; (2) caused great bodily harm to the victim or took an action that he knows would cause death to the victim; (3) knew that there was a strong probability of great bodily harm; or (4) the victim's death occurred during the course of committing a felony.   [10-2 at 185].   The relevant felony in the instant case was aggravated discharge of a firearm.   *Id*.   The trial attorney did not object to felony murder instruction.

On direct appeal, petitioner argued his trial counsel was ineffective for failing to challenge the felony murder instruction.   The appellate court ruled that the felony murder instruction was improper under Illinois law,[8] but concluded there was no underlying error.   The jury returned a general verdict finding petitioner guilty of murder.   The appellate court explained that the court presumes the jury convicted petitioner of the most serious crime charged.   [10-4 at 60].   In this case, that was intentional or knowing murder.   *Id*.   Consequently, the state court concluded the error in the felony murder instruction was harmless because the jury convicted petitioner under the intentional or knowing murder charge instead of felony murder.   *Id*.   Because any error was harmless, petitioner could not raise a *Strickland* violation for counsel's failure to challenge the felony murder instruction.

---

8 Respondent claims that the state court erred in holding that the felony murder instruction violated Illinois law, but respondent concedes that the court is bound by the Illinois court's interpretation of Illinois law on this point.

Before turning to the merits, the court addresses two preliminary points. First, petitioner raised a *Strickland* claim in the state court, arguing that his attorney was ineffective for failing to challenge the return of a general verdict based on an unlawful legal theory. Despite this, both parties briefed the underlying general verdict claim, and do not evaluate the claim under *Strickland*. Thus, the court shall proceed with the claim as presented by the parties.

Additionally, the parties agree that the claim is governed by the limitations of 28 U.S.C. § 2254(d) under the Antiterrorism and Effective Death Penalty Act. This is a questionable concession by petitioner. Petitioner raised his constitutional claims in his state court briefs. However, the state court applied a state law principle that it presumed the jury convicted petitioner on the intentional murder ground, instead of the felony murder ground. The state court did not consider whether the inclusion of the felony murder ground with the use of a general verdict form resulted in a constitutional violation. This raises the question of whether the claim should actually be reviewed under 28 U.S.C. § 2243's law and justice / de novo standard instead of § 2254(d)'s contrary to, or an unreasonable application of, clearly established law from the Supreme court, standard. Regardless, as explained below, the relevant standard is a non-issue since petitioner can meet the more demanding § 2254(d) standard because the state court ruling is contrary to clearly established law from the Supreme Court.

Turning to the underlying claim, common law principles instruct that a general verdict is valid so long as it is legally supportable "on one of the submitted grounds – even though that gave no assurance that a valid ground, rather than an invalid ground, was actually the basis of the jury's action." *Griffin v. United States*, 502 U.S. 46, 49 (1991). The common law principle covers the instant case. *Id*. at 50 (explaining that the common law "validated general verdicts returned on

multicount indictments where some of the counts were legally defective. . . .").[9]   The state court

ruling is best understood as an application of the common law, since it held that the general verdict

was proper because the court presumed the jury convicted petitioner of intentional murder, instead

of the unlawful felony murder ground.

The Supreme Court has recognized that the Constitution limits the common law rule.

"[W]here a provision of the Constitution forbids conviction on a particular ground, the

constitutional guarantee is violated by a general verdict that may have rested on that ground."

*Griffin*, 502 U.S. at 53 (citing *Stromberg v. California*, 283 U.S. 359, 368 (1931)).

Petitioner argues that his conviction should be vacated under *Stromberg*.   In *Stromberg*, a

general verdict "'rested on an instruction that the petitioner could be found guilty for displaying a

red flag as 'a sign, symbol, or emblem of opposition to organized government, or as an invitation

or stimulus to anarchistic action, or as an aid to propaganda that is of a seditious character.'"

*Hedgpeth v. Pulido*, 555 U.S. 57, 60 (2008) (per curiam) (quoting 283 U.S. at 363).   The Supreme

Court held that the criminalized conduct of displaying a red flag in opposition to the government,

in support of anarchy or sedition was protected speech under the First Amendment.   *Id*.   The

Supreme Court reversed the conviction because "'it was impossible to say under which clause of

the instruction the conviction was obtained.'"   *Hedgpeth*, 555 U.S. at 60 (quoting 283 U.S. at

368).

Petitioner argues that as in *Stromberg*, it is impossible to know which clause of the

instruction the conviction was obtained.   The Supreme Court in *Griffin v. United States* instructed

that *Stromberg* should not be read beyond its fact pattern.   "[T]he holding of *Stromberg*, do[es]

---

9 The Illinois Supreme Court has traced back its application of the common law rule to 1828.
*Illinois v. Smith*, 906 N.E.2d 529, 539 (Ill. 2009) (citing *Curtis v. Illinois*, 1 Ill. 256, 260 (1828)).

16

not necessarily stand for anything more than the principle that, where a provision of the Constitution forbids conviction on a particular ground, the constitutional guarantee is violated by a general verdict that may have rested on that ground." 502 U.S. at 53. *Stromberg*, as interpreted by *Griffin*, does not help petitioner because the jury in *Stromberg* was asked to convict petitioner for engaging in constitutionally protected conduct. Here, there is no constitutionally protected conduct.[10]

Although *Stromberg* is not directly on point, *Yates v. United States*, 354 U.S. 298 (1957), *overruled on other grounds by Burks v. United States*, 437 U.S. 1 (1978), is better for petitioner. *Yates* applies *Stromberg* to a challenge to a general verdict when the jury is instructed on an improper legal theory. But, the Supreme Court in *Griffin* questioned the validity of *Yates*, and referred to it as an "unexplained extension" of *Stromberg*. 502 U.S. at 56. The *Griffin* court also noted that *Yates* did not explain the reasoning supporting the extension of *Stromberg*, but questions that the Due Process Claims "is an unlikely basis." *Id*. Despite questioning *Yates*, *Griffin* did not consider whether to continue the Supreme Court's adherence to *Yates* because that question was not at issue in *Griffin*. *Id*.

The underlying legal justification for *Yates* is important to determine because *Yates* (as well as *Griffin*), unlike *Stromberg*, arose as a federal prosecution. This raises the question of

---

10 Petitioner also cites to *Flore v. United States*, 531 U.S. 226 (2001) (per curiam), *Davis v. United States*, 417 U.S. 346 (1974), and *Sandstrom v. Montana*, 442 U.S. 510 (1979), in support of his claim. However, these cases do not help him. In *Flore* and *Davis*, the Supreme Court overturned a conviction when the defendant was convicted of conduct that was later determined to be lawful conduct. *Flore*, 531 U.S. at 226; *Davis*, 417 U.S. at 346. However, petitioner's conduct of orchestrating the killing of another person is unlawful. *Flore* and *Davis* are inapplicable to petitioner's case. *Sandstrom* holds that the prosecution cannot improperly shift the burden of disproving an element of the crime charged to the defendant. 442 U.S. at 524. There was no shifting of the burden of proof in this case.

whether *Yates* is establishing a constitutional principle or involves a supervisory principle. *Griffin* does not resolve that issue. *Yates* must involve a federal constitutional principle to apply in a habeas corpus case, and it must be clearly established federal law, in order to apply under § 2254(d). *See Tenner v. Gilmore*, 184 F.3d 608, 612 (7th Cir. 1999).

Despite the uncertainty involving *Yates* caused by *Griffin*, this court is satisfied that *Yates* is clearly established federal law from the Supreme Court of the United States applicable to petitioner's case based on the Supreme Court's ruling in *Hedgpeth*, 555 U.S. 57. In *Hedgpeth*, the petitioner was convicted in a California state court pursuant to an erroneous felony murder jury instruction. 555 U.S. at 59. *Hedgpeth*, recognized that the case was governed by the principle from *Stromberg* and *Yates* that a "conviction based on a general verdict is subject to challenge if the jury was instructed on alternative theories of guilt and may have relied on an invalid one." *Id.* at 58 (citing 354 U.S. 298; 283 U.S. 359). Despite the application of *Stromberg* and *Yates* to the case, *Hedgpeth* held that the error was subject to harmless error review. 555 U.S. at 61.

Although *Hedgpeth* did not discuss *Griffin's* critique of *Yates*, the fact that *Griffin* did not overrule *Yates*, and *Hedgpeth* set forth and applied the rule from *Yates* to a § 2254 habeas corpus proceeding of a state conviction, indicates that *Yates* is clearly established federal law. *See Sorich v. United States*, 709 F.3d 670, 673 (7th Cir. 2013) ("The Supreme Court ruled in *Yates v. United States*, 354 U.S. 298 (1957), that constitutional error occurs when a jury is instructed on alternative theories of guilt and returns a general verdict that may have relied on a legally invalid one.").[11]

---

11 Respondent argues that *Hedgpeth* and *Skilling* do not apply to this case because they were decided after the state court ruling. It is true that the court, when evaluating a claim under § 2254(d), is limited to considering the clearly established federal law from the Supreme Court at the time of the relevant state court decision. *Yarborough v. Alvarado*, 541 U.S. 652, 661 (2004). However, *Yates* is clearly established federal law that was available to the state court at the time of

18

With the court concluding that *Yates* applies, the court must find that an error occurred with the return of the general verdict that included an improper legal theory. *See Skilling v. United States*, 561 U.S. 358, 414 (2010) (citing *Yates*, 354 U.S. at 298) ("Constitutional error occurs when a jury is instructed on alternative theories of guilt and returns a general verdict that may rest on a legally invalid theory.") (holding that conviction is flawed when indictment alleged an improper statutory ground for conviction). There is no dispute that the jury was instructed on an improper legal theory and returned a general verdict. That is constitutional error pursuant to *Yates*. The state court ruling is contrary to *Yates*. Petitioner satisfies § 2254(d) (and certainly would satisfy § 2243 if that standard is applied).

Although there is a constitutional violation, the question becomes whether petitioner is entitled to relief. As mentioned, *Hedgpeth* holds that the *Stromberg / Yates* error is subject to harmless error analysis. 555 U.S. at 61. The state court did not engage in a harmless error analysis under *Chapman v. California*, 386 U.S. 18 (1967). The state court did say there was "overwhelming evidence of defendant's guilt," but that conclusion related to whether petitioner could demonstrate prejudice under *Strickland*. [10-4 at 60]. Thus, *Brecht v. Abrahamson's*

---

its decision because *Yates* was decided in 1957. *Hedgpeth* and *Skilling*, which were decided after the state court decision, simply restate the already clearly established law from *Yates*.

The only "new" law is *Hedgpeth's* holding that the *Stromberg / Yates* error is subject to harmless error review. The court applies *Hedgpeth* even though it was decided after the state court ruling because petitioner is not arguing that the state court ruling in contrary to, or unreasonable application, of *Hedgpeth*. To the contrary, *Hedgpeth* is harmful to petitioner because it holds that harmless error is applied to a *Stromberg / Yates*. Respondent's argument that *Hedgpeth* is inapplicable is counter-intuitive because respondent needs the benefit of *Hedgpeth's* holding that harmless error should be applied. The court also appreciates that there is a potential *Teague* question regarding the application of *Hedgpeth* to petitioner's case. However, the court believes any concerns are resolved by *Hedgpeth* itself because that was a § 2254 habeas corpus case.

substantial and injurious effect standard controls the review of the claim.   *Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015) (citing 507 U.S. 619, 637 (1993)); *see Sorich*, 709 F.3d at 674-75 (applying *Brecht* analysis to *Yates* error to consider whether jury would have convicted defendant under proper legal theory).

"This inquiry does not ask whether the jurors 'were ... right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision.'"   *Sorich*, 709 F.3d at 674 (quoting *Kotteakos v. United States*, 328 U.S. 750, 764 (1946)).   "If a court is in 'grave doubt' about whether the error is harmless, meaning that, 'in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error,' the court is to treat the error as though it affected the verdict."   *Sorich*, 709 F.3d at 674 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995)).[12]

Due to the importance of the issue, the court calls for additional briefing from the parties as to whether the *Yates* error is harmless under the *Brecht* standard.   The court recruits Kenneth A. Kroot, Jenner & Block LLP, 353 N. Clark Street, Chicago, IL 60657, to represent petitioner pursuant to counsel's trial bar obligation under Local Rule 83.11(g).

---

12 As discussed below, trial counsel's strategy was to argue that Falls alone was responsible for the shooting, and that petitioner was an innocent bystander.   This theory of the case further calls into question the basis for the jury's general verdict.

3.     **Claim Three:   Ineffective Assistance of Trial Counsel for Failing to Request Various Jury Instructions, and Failing to Prevent the Jury from Learning that the Shooter had been Convicted of Murder.**

Petitioner argues that his trial attorney was ineffective for failing to request an accomplice witness jury instruction, and for failing to request a lesser included offense of involuntary manslaughter or reckless conduct.   Finally, petitioner argues his attorney was ineffective for allowing the jury to hear that the shooter (Falls) had been adjudicated a delinquent for murdering the victim.   Because this claim was adjudicated and rejected on the merits by the state appellate court on direct appeal, the claim is governed by 28 U.S.C. § 2254(d).

Petitioner must demonstrate that the state court ruling was contrary to, or an unreasonable application of, clearly established federal law from the Supreme Court of the United States.   The ineffective assistance of counsel claim is governed by *Strickland v. Washington*, 466 U.S. 668 (1984). To demonstrate ineffective assistance of counsel, petitioner must demonstrate both deficient performance and prejudice. *Premo v. Moore*, 562 U.S. 115, 121 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)). The court's review under *Strickland* is deferential, and applying *Strickland* under the AEDPA (which itself also requires deference) results in a double level of deference to the state court determination. *Knowles*, 556 U.S. at 123.

The state court ruling is not contrary to *Strickland* because the court identified the proper legal standard.   [10-4 at 52].   The court's ruling is also not an unreasonable application of *Strickland*.   The state court recognized that defense counsel's primary strategy at trial was to suggest that Falls was responsible for the shooting and petitioner was just an innocent bystander. This is a reasonable strategy because Falls was convicted of shooting the victim.   *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (citing *Strickland*, 466 U.S. at 689) ("A court considering a claim

21

of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance.).   The three challenged actions by counsel --- the failure to provide the accomplice instruction, failure to seek a lessor included charge, and allowing the jury to hear that Falls was convicted of murder for shooting the victim --- are all consistent with defense counsel's strategy to argue to the jury that Falls was the responsible party and petitioner was an innocent bystander.  *See McAfee v. Thurmer*, 589 F.3d 353, 355-56 (7th Cir. 2009) (holding that defense counsel provided competent representation when he argued that another person (there, a police office), had shot the victim instead of petitioner, and argued for complete acquittal instead of allowing instruction on lesser included offense).   There is no deficient performance by defense counsel.

As the state court ruling also recognized, petitioner cannot be prejudiced by defense counsel's failure to include the challenged jury instruction or an instruction on a lessor included offense.   As noted above, counsel performed well within his obligations under *Strickland* in pursuing a theory that Falls was responsible and petitioner was merely an innocent bystander. Addition of a lesser included offense instruction could confuse the jury under the unique facts of this case.   Choosing to omit such an instruction was a permissible strategic decision.   This claim is denied.

**D.     Conclusion**

Petitioner's ineffective assistance of counsel arguments (Claims One and Three) are denied.   The parties are directed to provide additional briefing regarding the due process issue (Claim Two) in accordance with the court's opinion.   The court recruits Kenneth A. Kroot, Jenner & Block LLP, 353 N. Clark Street, Chicago, IL 60657, to represent petitioner pursuant to

counsel's trial bar obligation under Local Rule 83.11(g).   On the court's own motion, respondent

Randy Pfister is terminated.   Michael Melvin, Acting Warden, Pontiac Correctional Center, is

added as respondent.   The Clerk shall also alter the case caption to *Czech v. Melvin*.   This matter

is set for a report on status and to set a briefing schedule on September 8, 2016, at 9:00 a.m., after

recruited counsel has had a chance to review this opinion and the record.


**ENTER:          August 3, 2016**

_____
**Robert W. Gettleman
United States District Judge**

23

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Kevin Czech, (K90539),      )
                     )
        Petitioner,    )
                     )     Case No. 14 C 2012
     v.            )
                     )     Judge Robert W. Gettleman
                     )
Michael Melvin, Acting Warden,   )
                     )
        Respondent.   )

## <u>MEMORANDUM OPINION AND ORDER</u>

This decision is a follow up to the court's August 3, 2016, opinion in <u>Czech v. Pfister</u>, No.

14 C 2012, 2016 WL 4158925 (N.D. Ill. Aug. 3, 2016).   The court presumes the reader's

familiarity with the August 3rd decision.   In that decision, the court considered petitioner's 28

U.S.C. § 2254 habeas corpus petition (Dkt. 1) and denied petitioner's ineffective assistance of

counsel arguments (Claims One and Three).

As to the remaining claim (Claim Two), the court concluded that petitioner's due process

rights were violated when the jury returned a general verdict that may have relied upon an invalid

legal theory.   <u>Id</u>. at *10 (citing <u>Yates v. United States</u>, 354 U.S. 298 (1957)).   The court called for

additional briefing regarding whether the due process violation resulted in a "'substantial and

injurious effect or influence in determining the jury's verdict.'"   <u>Brecht v. Abrahamson</u>, 507 U.S.

619, 623 (1995) (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)).   Having

reviewed the parties' additional briefing,[1] the court concludes that the constitutional error did not

have a substantial and injurious effect or influence on the jury's verdict.   Accordingly, Claim Two

---

1 The Court thanks Messrs. James T. Malysiak and Aaron J. Hersh of Jenner & Block LLP for
their *pro bono* representation of petitioner in the supplemental briefing on the <u>Brecht</u> issue.

is denied.   The habeas corpus petition is denied on the merits.   The court will issue a certificate of appealability.

**A.     Background**

**1.     The Facts**

The following facts are repeated from the court's August 3, 2016, order and were initially drawn from the Illinois Appellate Court's opinion on direct appeal.   Illinois v. Czech, No. 1-02-0982 (Ill. App. Ct. Mar. 31, 2004) (Rule 23 Order).[2]   The state court findings are presumed correct, and petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence.   Brumfield v. Cain, 135 S. Ct. 2269, 2282 n.8 (2015) (citing 28 U.S.C. 2254(e)(1)).

The case arises from petitioner's alleged orchestration of a gang related drive-by shooting on September 24, 1999.   Czech, 2016 WL 4158925, at *1.   Petitioner was a member of the Maniac Latin Disciples street gang, a rival of the Latin Kings street gang.   Id.   The shooting occurred in an area controlled by the Latin Kings.   Id.   The victim, a 14-year-old boy, was an innocent bystander, unaffiliated with either gang.   Id.

Petitioner, Roberto Mejia, Marquis Falls, and Nancy Malaves were riding in a car together when the crime occurred.   Id. at *2.   Mejia, age 18, was dating Malaves, age 15.   Petitioner was 20 years old, and Falls was 13.   Id.

---

2  The state appellate court opinion on direct appeal provided by respondent is missing the final 13 pages.   (Dkt. 10-1, pg. 6-25.)   The full state court opinion is attached to the state postconviction petition that was included in the record.   (Dkt. 10-4, pg. 42-74).   The court has used that full copy of the state court opinion.

Both Malaves and Falls testified for the prosecution.  Id. at *3.  According to Malaves, the plan for the evening was for Mejia and her to have a double date at the movies with petitioner and his girlfriend.  Id.  When Malaves and Mejia picked up petitioner, he informed them that they were going to "cruise by the Kings," instead of going to the movies.  Id.  He also instructed them to pick up Falls.  Id.  Petitioner again stated they would be "cruising by some Kings," after the group picked up Falls.  Id.

Approximately one month earlier, petitioner gave Falls a .357 revolver to hold for the gang. Id.  Falls was considered a "pee wee" in the Maniac Latin Disciples because he was too young to be a full member.  Id.  As a pee wee, he earned "stars" by performing tasks for older gang members, such as holding guns for them.  Id.  Falls kept the .357 revolver hidden behind a garbage can in an alley, and checked on the gun daily.  Id.

The group drove to the alley and retrieved the gun.  Id.  Falls gave the gun to petitioner when he returned to the car.  (Dkt. 10-1, pg. 144).  Falls testified at trial that petitioner stated "he needed a gun to shoot at" or "light up some Kings."  (Dkt. 10-4, pg. 48).  Falls further testified that petitioner told Falls that either he or Falls would shoot at the Latin Kings.  Id. at 48-49. Petitioner's plan had Falls shoot at the Latin Kings if they were on his side of the car, while petitioner would perform the task if the rival gang members were on his side.  Czech, 2016 WL 4158925, at *3.

The group drove to the Latin Kings' area where approximately 15 people, including the victim, were standing on the sidewalk on Falls' side of the car.  Id.  As they drove by, petitioner said, "King love," to the group, and made Latin King gang signs with his hands.  Id.  The men on

3

the sidewalk responded with "King love" and Latin King gang signs.  Id.  Petitioner also

identified a ranking Latin King member, Chino, to Falls.  (Dkt. 10-1, pg. 146).

The car drove around the block and made a second pass by the men.  Czech, 2016 WL

4158925, at *3.  This time, petitioner told Malave to "close her ears, she was gonna hear

something loud."  Id.  At the same time, petitioner handed the gun to Falls and instructed him to

shoot at the group of Latin Kings.  Id.  Petitioner shouted "King killer" and "Maniac love" from

the car, (Dkt. 10-1, pg. 105), while Falls fired five shots, with one of the bullets killing the victim.

Czech, 2016 WL 4158925, at *3.

Four days later, the police arrested a different man, Daniel Garcia, for the shooting.  Id.

Garcia, who knew petitioner and the others involved, told the police that he had heard petitioner

admit to his involvement in the shooting.  Id.  This led the police to bring petitioner, Mejia,

Malaves, and Falls in for questioning.  Id.  Petitioner confessed to the shooting in a statement to

the police, and in a videotaped statement made to an assistant state's attorney.  Id.

Falls[3] and Malaves, as well as witnesses who were standing among the group on the

sidewalk during the drive-by shooting, testified for the prosecution at trial.  Id. at *3.  Petitioner's

confessions were also presented to the jury.  Id. at *2.[4]  At the completion of trial, the jury found

petitioner guilty of murder and unlawful possession of a firearm.  Id. at *1, *3.

---

3 Both Falls and Mejia were tried separately from petitioner.  Falls was tried as a juvenile and
was found guilty of first degree murder for his participation in the murder.  Id. at *3.  Mejia was
tried as an adult, and was convicted of first degree murder and aggravated discharge of a firearm.
Mejia v. Hulick, No. 06 C 0384, 2007 WL 1317131 (N.D. Ill. May 1, 2007) (Lefkow, J.) (denying
petition for writ of habeas corpus), denying certificate of appealability sub nom., Mejia v.
McCann, No. 07-2347 (7th Cir. Dec. 10, 2007).

4 Chicago Police Department Detective Barbara Healy, who obtained petitioner's first oral
confession, related the confession during her in-court testimony. It appears that Detective Healy
did not attempt to record the first confession. Following petitioner's first confession, a second

4

### 2.    Petitioner's Claim

Petitioner's instant claim is that his murder conviction cannot stand because the jury was instructed on an impermissible felony murder theory in addition to being instructed on the elements of Illinois's murder statute, 720 ILCS 5/9-1.   The jury was instructed that it should find petitioner guilty of murder if he: (1) intended to kill the victim; (2) caused great bodily harm to the victim or took an action that he knows would cause death to the victim; (3) knew that there was a strong probability of great bodily harm; or (4) the victim's death occurred during the course of committing a felony.   (Dkt. 10-2, pg. 185).   The fourth ground is the felony murder instruction and the relevant felony was aggravated discharge of a firearm.   Id.   The defense attorney did not object to the felony murder instruction and the jury returned a general verdict finding petitioner guilty of murder.

On direct appeal in the state court, petitioner argued that his trial counsel was ineffective for failing to challenge the felony murder instruction.   The appellate court ruled that the felony murder instruction was improper under Illinois law,[5] but concluded there was no underlying error. The appellate court explained that the court presumes the jury convicted petitioner of the most serious crime charged; intentional or knowing murder. (Dkt. 10-4, pg. 60).   Consequently, the

_____

(cont...) confession, which was tape-recorded, was obtained by an ASA. The tape-recorded confession was played for the jury, but it was not transcribed in the trial transcripts. The state court opinion on direct appeal states that the videotape of the second confession was part of the record on appeal. However, respondent did not file a copy of the video in the present habeas corpus record. Regardless, the state appellate court opinion states that petitioner confessed to the detective, and a second time in a recorded videotape statement given to the ASA. Petitioner does not challenge these facts or otherwise attempt to challenge the presumption of correctness of these findings.

5  Respondent claims that the state court erred in holding that the felony murder instruction violated Illinois law, but concedes that the court is bound by the Illinois court's interpretation of Illinois law on this point.

state court concluded that the error in the felony murder instruction was harmless because the jury

convicted petitioner under the intentional or knowing murder charge instead of felony murder.

Id.  Because any error was harmless, petitioner could not raise a Strickland violation for counsel's

failure to challenge the felony murder instruction.

In considering petitioner's claim in the August 3, 2016, opinion, this court addressed two

preliminary matters before turning to the underlying claim.    First, the court noted that the parties

had both briefed the underlying general verdict issue, when petitioner had raised a Strickland claim

in the state courts.   Czech, 2016 WL 4158925, at *8.   Because respondent did not raise a

procedural default defense as to the general verdict claim, the court proceeded to the general

verdict issue briefed by the parties.   Eichwedel v. Chandler, 696 F.3d 660, 669 (7th Cir. 2012)

(instructing that procedural default is an affirmative defense which is forfeited if not properly

asserted before the district court).

Second, the court questioned whether petitioner's claim was governed by the limitations of

28 U.S.C. § 2254(d) of the Antiterrorism and Effective Death Penalty Act because the state

appellate court did not consider petitioner's constitutional claim that the inclusion of the felony

murder instruction with the use of a general verdict form violated his due process rights.   Czech,

2016 WL 4158925, at *8.   Instead, the state court applied a principle of state law when it

concluded that the jury convicted petitioner of the most serious charge of intentional or knowing

murder.   Id.  This court recognized that this raised the question of whether the § 2243 law and

justice / de novo standard instead of the § 2254(d) standard should apply to the claim.   Id.   The

court declined to resolve the issue because the state court ruling was contrary to clearly established

6

precedent from the United States Supreme Court, satisfying the more demanding § 2254(d) standard.  Id.

Turning to the underlying claim, this court explained that the state court ruling was best understood as an application of the common law principle that a verdict is valid so long as it is legally supportable by one of the grounds submitted to the jury even if an impermissible ground was also submitted.  Id. at *9 (citing Griffin v. United States, 502 U.S. 46, 49-50 (1991)). Despite the fact that the verdict was consistent with common law principles, that did not resolve petitioner's claim because it does not address the constitutional issue.

The clearly established precedent holds that a "'conviction based on a general verdict is subject to challenge if the jury was instructed on alternative theories of guilt and may have relied on an invalid one.'"  Id. at *10 (quoting Hedgpeth v. Pulido, 555 U.S. 57, 58 (2008) (per curiam) (citing Yates v. United States, 354 U.S. 298 (1957); Stormberg v. California, 283 U.S. 359 (1931)).  Accordingly, this court concluded that it was constitutional error when the jury was instructed on an improper legal theory and returned a general verdict that might have relied on the invalid theory.  Id.  Consequently, the state court ruling to the contrary violated clearly established federal law on this point.

The court then considered whether the error could have been harmless, noting that the state court did not recognize the constitutional error and, therefore, did not engage in the harmless error analysis required under Chapman v. California, 386 U.S. 18 (1967).  Czech, 2016 WL 4158925, at *11.  As a result, Brecht's substantial and injurious effect standard controlled the harmless error review of the claim before this court.  Czech, 2016 WL 4158925, at *11 (citing Davis v.

7

Ayala, 135 S. Ct. 2187, 2198 (2015); 507 U.S. at 639; Sorich v. United States, 709 F.3d 670, 674-75 (7th Cir. 2013)).   The court called for additional briefing on the Brecht issue.

**B.     Analysis**

    **1.     The Brecht Standard**

In Hedgpeth, the Supreme Court, citing Brecht, held that the error at issue in this case --- a general verdict that may have relied on an invalid legal theory --- is governed by harmless error when reviewed by a federal court concerning a habeas corpus petition.   555 U.S. at 61-62.   Under Brecht, habeas corpus petitioners "'are not entitled to habeas relief based on [a] trial error unless they can establish that it resulted in 'actual prejudice.'"   Davis, 135 S. Ct. at 2197-98 (quoting Brecht, 507 U.S. at 637; United States v. Lane, 474 U.S. 438, 449 (1986)).   "A federal court may grant habeas relief on a trial error only when that error "'had substantial and injurious effect or influence in determining the jury's verdict.'"   Calderon v. Coleman, 525 U.S. 141, 145 (1998) (quoting Brecht, 507 U.S. at 637; Kotteakos v. United States, 328 U.S. 750, 776 (1946)).   "There must be more than a 'reasonable possibility' that the error was harmful."   Davis, 135 S. Ct. at 2198 (quoting Brecht, 507 U.S. at 637).   "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless. And, the petitioner must win."   O'Neal v. McAninch, 513 U.S. 432, 436 (1995).   There is grave doubt when "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error."   Id. at 435.   "The Brecht standard reflects the view that a 'state is not to be put to the arduous task of retrying the defendant based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the

8

error.'" <u>Davis</u>, 135 S. Ct. at 2198 (quoting <u>Calderon</u>, 525 U.S. at 146)).    But, the <u>Brecht</u> standard

is less demanding than the <u>Chapman</u> harmless error standard used on direct appeal.    <u>Fry v. Pliler</u>,

551 U.S. at 116 (citing 386 U.S. 18, 24 (1967)).

Occasionally, the <u>Brecht</u> issue is resolved by the jury returning a special verdict in addition

to the defective general verdict.    For example, in <u>Berry v. Jacuez</u>, the trial court, like the state

court in this case, erred under state law when including a felony murder instruction as a possible

basis for the jury to convict the defendant of murder.    644 Fed. Appx. 740, 741 (9th Cir. Mar. 8,

2016) (non-precedential opinion).    The Ninth Circuit found that the error did not have a

substantial and injurious effect on the jury's verdict because the jury made a special finding that

the prisoner had acted with the requisite intent, demonstrating that the impermissible felony

murder ground was not relied upon by the jury.    <u>Id</u>. at 741 ("Because the jury found implied

malice, the potential harm posed by the felony murder instruction never materialized.    Any error

was therefore harmless . . . ."); <u>see also</u> <u>Tapia v. Roe</u>, 189 F.3d 1052, 1056-57 (9th Cir. 1999)

(failure to include a required jury instruction regarding "intent to encourage or facilitate the

criminal offense" for aiding and abetting instruction was cured by the jury's special finding that

the defendant "had or shared specific intent to kill."); <u>Tenner v. Gilmore</u>, 184 F.3d 608, 612 (7th

Cir. 1999) (recognizing that a special verdict resolves the issue of whether a general verdict was

premised on an impermissible ground because "the court [] can be confident that the facts as the

jury believed them to be are a legally proper basis of conviction.").

A special finding from the jury is not the only way for the state to succeed under <u>Brecht</u>.

In <u>Roy v. Gomez</u>, the Ninth Circuit held that a specific finding from the jury was necessary to

demonstrate that the jury relied upon the proper legal theory.    81 F.3d 863, 867-68 (9th Cir. 1993)

(en banc), rev'd sub nom., California v. Roy, 519 U.S. 2 (1996) (per curiam). The Ninth Circuit

concluded that it was "not free to evaluate the evidence and postulate what the jury would have

found had it been properly instructed." Roy, 81 F.3d at 867. The dissent in Roy argued that the

court must review the record to determine if a rational and properly instructed jury would have

found the defendant guilty under the proper legal theory when performing the Brecht harmless

error review. Roy, 81 F.3d at 870-71 (Wallace, J., dissenting).

On appeal, the Supreme Court agreed with the dissent. California v. Roy, 519 U.S. 2, 4

(1996) (per curiam). Accordingly, a special finding is not the only way to satisfy Brecht. When

performing the Brecht review, the court must make a "*de novo* examination of the record as a

whole in order to determine whether the error had substantial and injurious effect or influence in

determining the jury's verdict." Jenkins v. Nelson, 157 F.3d 485, 496 (7th Cir. 1998); Brecht,

507 U.S. at 640 (Steven, J., concurring). Put another way, the question for the court, when

reviewing the record as a whole, is whether a rational jury would have found petitioner guilty of

murder if it had been properly instructed. Jenkins, 157 F.3d at 496 (citing Roy, 81 F.3d at 870

(Wallace, J., dissenting)).[6] In sum, if a review of the evidence demonstrates that a properly

instructed rational jury would have found petitioner guilty under a legal theory of murder,

petitioner was not prejudiced by the erroneous felony murder instruction.

---

6 In his supplemental reply brief, petitioner quotes extensively from Suniga v. Bunnell, 998 F.2d
664 (9th Cir. 1993), and Sheppard v. Rees, 909 F.2d 1234 (9th Cir. 1989). (Dkt. 33, pg. 5-7).
Both cases are predicated upon the view that an erroneous jury instruction is not subject to
harmless error review. Sheppard, 909 F.2d at 1237; Suniga, 998 F.2d at 670. These cases are in
conflict with the intervening Supreme Court rulings in California v. Roy, 519 U.S. 2 (1996) (per
curiam); Neder v. United States, 527 U.S. 1 (1999); and Hedgpeth v. Pulido, 555 U.S. 57 (2008)
(per curiam), which all hold that a jury instruction error is reviewable under harmless error
including the Brecht harmless error standard. Roy, 519 U.S. at 6; Neder, 527 U.S. at 4; Hedgpeth,
555 U.S. at 60-61.

## 2.     The Application of <u>Brecht</u> to the Instant Case

### A.     The Overwhelming Evidence of Petitioner's Guilt

Petitioner is not entitled to relief because the evidence of his guilt is overwhelming.     <u>See</u> <u>Brecht</u>, 507 U.S. at 639 (finding defendant was not entitled to relief when applying <u>Brecht</u> standard because evidence supported defendant's guilt); <u>Brown v. Rednour</u>, 637 F.3d 761, 767 (7th Cir. 2011) (finding prisoner was not entitled to relief when applying <u>Brecht</u> standard because evidence of guilt was overwhelming).     Accordingly, a properly instructed rational jury would have found petitioner guilty of murder under a proper legal theory.     <u>Jenkins</u>, 157 F.3d at 496. Consequently, the erroneous felony murder instruction did not have "a substantial and injurious effect or influence in determining the jury's verdict" in the instant case.     <u>Brecht</u>, 507 U.S. at 637.

As previously mentioned, the jury was instructed that it should find petitioner guilty of murder if he: (1) intended to kill the victim; (2) caused great bodily harm to the victim or took an action that he knows would cause death to the victim; (3) knew that there was a strong probability of great bodily harm; or (4) the victim's death occurred during the course of committing a felony. (Dkt. 10-2, pg. 185)..   As previously discussed, the fourth ground instructing the jury on felony murder was improper because the felony at issue was the wrongful discharge of the murder weapon.   A properly instructed jury would have considered only the first three grounds.

As described previously, the evidence at trial showed that petitioner, a member of the Maniac Latin Disciples street gang, intended to shoot at the Latin Kings, a rival street gang, in a drive-by shooting.   <u>Czech</u>, 2016 WL 4158925, at *1.   Malaves, who was present for the entire incident, testified that the original plan was for petitioner, his girlfriend, Malaves, and Mejia, to go

11

on a double date at the movies.   Id. at *3.   Malaves testified that petitioner changed the plan for the evening, instructing that the group was going to "cruise by the Kings."   Id.

Petitioner also instructed the group to pick up Falls, a 13-year-old pee wee member of the Maniac Latin Disciples who had been hiding a gun for petitioner.   Id.   After picking up Falls, the group traveled to where Falls hid the gun so that he could retrieve it.   Id.   Falls then gave the gun to petitioner.   Id.   Petitioner then instructed Falls that he planned to shoot at the Latin Kings and that either he or Falls would do the shooting depending on which side of the car the rival gang members were standing.   Id.

When the group first drove by the Latin Kings petitioner said "King love," and flashed Latin Kings gang signs.   Id.   The Latin Kings responded by saying "King love," and returning Latin King gang signs.   Id.   By flashing Latin King gang signs and shouting a Latin King greeting, petitioner was able to identify his target as Latin King gang members.   Petitioner also pointed out Chino, a ranking Latin King member, further demonstrating his identification of the group as Latin Kings, and further working towards his stated goal of shooting at them.   (Dkt. 10-1, pg. 146).   By using the Latin King greeting and gang signs, petitioner lulled his targets into a false sense of security.   This provided petitioner with the element of surprise when he drove around the block making the second pass at the Latin Kings.   Petitioner further showed his intent to murder the Latin Kings when he shouted "King Killer" and "Maniac Love" from the car during the shooting.   (Dkt. 10-1, pg. 105).   All of this evidence demonstrated petitioner's criminal intent.

The evidence also demonstrated that petitioner led the shooting.   Petitioner gave Falls the gun immediately before the shooting and directed Falls that either he or Falls would shoot at Latin

12

Kings depending on which side of the car the group was standing.   <u>Czech</u>, 2016 WL 4158925, at

*3.   Additionally, petitioner directed Malave to "close her ears, she was gonna hear something

loud."   <u>Id</u>.   In addition to the above evidence, petitioner confessed to the crime on at least three

different occasions following the shooting: first to Daniel Garcia, who led the police to petitioner;

again during questioning by the police; and for a third time in a videotaped statement given to the

assistant state's attorney.   <u>Id</u>.

 This evidence demonstrated that petitioner was the leader of the drive-by shooting.   There

is no doubt that a properly instructed jury hearing the evidence would have convicted petitioner of

murder under a proper legal theory.   The fact that petitioner likely did not intend to kill the victim,

an innocent bystander who was unaffiliated with the Latin Kings, is of no moment.   Illinois

applies the transferred intent doctrine --- sometimes referred to as "intent follows the bullet."

<u>Illinois v. Grib</u>, No. 1-15-1702, 2016 WL 7323285, at *7 (Ill. App. Ct. Dec. 14, 2016).   Petitioner

is responsible for murdering the victim because his intent to kill the Latin Kings transferred to his

unintended victim.   <u>Id</u>.   Poor marksmanship does not eviscerate intent.

 Additionally, the fact that Falls shot the gun that killed the victim does not excuse

petitioner's liability for his actions.   The evidence clearly established that petitioner orchestrated

the shooting and directed Falls to shoot at the Latin Kings.   <u>Illinois v. Jones</u>, 69 N.E.3d 226,

234-35 (Ill. App. Ct. 2016) (quoting <u>Illinois v. Brown</u>, 557 N.E.2d 199, 207 (Ill. App. Ct. 1990)

("Illinois law does not draw a distinction between the perpetrator of an offense and one who is

accountable for his conduct: 'the accountable defendant stands in the shoes of his accomplice.'").

 Petitioner argued at trial, and again in his supplemental briefing, that Falls was the

responsible party and that he was an innocent bystander.   Although this might have been a

13

reasonable trial strategy made by competent counsel in light of the overwhelming evidence against

petitioner, it is an argument that a rational jury would reject.   At the time of the shooting,

petitioner was a 20-year-old gang member.   In contrast, Falls was a 13-year-old pee wee member.

Falls held the gun on petitioner's behalf in the weeks leading up to the shooting as a way for him to

earn "stars" in the gang.   A rational jury would reject the suggestion that a 13-year-old pee wee

gang member would be giving orders to a 20-year-old gang member.

Defense counsel's strategy to assign blame to Falls for the shooting might have been

reasonable because the jury heard that Falls was the shooter and had been adjudicated delinquent

of murder as a juvenile.   Czech, 2016 WL 4158925, at *11.   But, there is no evidence to show

that Falls was the ringleader and petitioner was an innocent bystander as he claims.

### B.     Petitioner's Supplement Briefing Arguments

Petitioner's arguments in his supplemental briefing do not change the fact that the

overwhelming evidence was against him.   In support of his argument that the jury likely

convicted him under the improper felony murder theory, petitioner claims that the prosecutor

emphasized the felony murder theory in closing arguments.   He also argues that because there

was insufficient evidence to support the other theories of murder the jury could have convicted

based only on the felony murder theory.   These arguments fail for several reasons.

First, the prosecutor did not emphasize felony murder as the primary theory of the case in

closing argument as petitioner suggests.   The prosecutor initially argued for the proper murder

theories and presented felony murder only as a fallback argument.   (Dkt. 10-2, pg. 147-48).

After discussing the three permissible grounds and the associated evidence, the prosecutor stated,

"I submit that establishes that what happened out there was murder."   Id. at 148.   The prosecutor

had made no mention of felony murder up to that point in the closing argument.

Introducing felony murder as a fallback option, the prosecutor argued that even if the jury

gave petitioner "the benefit of any conceivable doubt to think well he didn't want anyone to get

hurt; for some reason feel sorry for him," the jury could convict under felony murder.   Id.   The

prosecutor then explained the felony murder charge.   In the rebuttal closing argument, the

prosecutor made no mention of felony murder, instead emphasizing the evidence demonstrating

that petitioner intended to kill the Latin Kings.   The prosecutor discussed the felony murder

standard for a total of two pages of the trial transcript while the full closing and rebuttal argument

spans 37 pages.   (Dkt. 10-2, pg. 127-50, 159-73).   The felony murder argument charge was a

fallback argument.   It was not the main thrust of the prosecution's case.

Further, the prosecutor's mention of felony murder has minimal relevance to the court's

review of the evidence under the Brecht standard.   As discussed above, the court's focus is on

what a rational jury would have found if it had been properly instructed.   Jenkins, 157 F.3d at 496.

In fact, petitioner agrees with this standard.   (Dkt. 31, pg. 7).   A prosecutor's closing argument

may help a reviewing court understand the prosecution's theory of the case and with it the

evidence at trial, so the court considers them as part of the *de novo* review of the entire record.

But, opening and closing arguments are not evidence, and the court's focus under the Brecht

standard is on the *evidence* before a properly instructed rational jury.

As a second argument, petitioner suggests that the evidence is not overwhelming.   He

argues that Falls is not credible because Falls testified that petitioner directed him to retrieve the

gun, while Malave testified that Falls alone directed Mejia to drive the car to the location where the

gun was stashed, and Falls retrieved the weapon on his own.   (Dkt. 31, pg. 10).   Petitioner further

argues that Falls cannot be believed because he was inconsistent regarding whether he was in the

front or back seat of the car, and whose idea it was for him to move to the front seat.   These minor

discrepancies do nothing to defeat the impact of the evidence against petitioner.

The court concludes, after reviewing the trial record, that the overwhelming evidence

proved that petitioner was the mastermind of the shooting.   It was petitioner who directed Mejia

to pick up Falls.   The fact that Falls had to direct the group to the gun, and that Falls got out of the

car to get the weapon, is consistent with petitioner as the leader and Falls his subordinate.   It is

reasonable that Falls would be the only person to know where the gun was located because he hid

it on petitioner's request.   A reasonable jury would conclude that Falls was petitioner's errand boy

who hopped out of the car to retrieve the gun that petitioner had asked him to hide until petitioner

needed it.

Petitioner also argues that there is insufficient evidence that he: (1) intended to kill the

victim; (2) caused great bodily harm to the victim or took an action that he knows would cause

death to the victim; or (3) knew that there was a strong probability of great bodily harm.   (Dkt. 31,

pg. 11-15).   The court is hesitant to find overwhelming evidence of either of the first two grounds,

but, at the very least, there was overwhelming evidence that petitioner knew that there was a strong

probability of great bodily harm from firing a gun at the Latin Kings.   See Illinois v. Teague, 986

N.E.2d 149, 155 (Ill. App. Ct. 2013) (citations omitted) ("[t]he very fact of firing a gun at a person

supports the conclusion that the person doing so acted with intent to kill").   Although Falls was

the person who shot the victim, petitioner is equally responsible.

16

Petitioner also argues that as a 13-year-old Falls did not likely appreciate the outcome of his conduct.   (Dkt. 31, pg. 12).   That argument hurts, rather than helps, petitioner.   Falls' age and his potential for not fully understanding his actions helps to demonstrate that Falls was Petitioner's subordinate.   This undermines petitioner's theory of the case that he was an innocent bystander and that Falls was the responsible party.

In sum, a properly instructed rational jury would have concluded that petitioner was the leader of the drive-by shooting that resulted in the victim's murder.   The overwhelming evidence of petitioner's guilt would have resulted in a rational jury convicting petitioner under a proper murder theory.   The fact that a properly instructed rational jury would have convicted petitioner under a proper legal theory means that the introduction of the improper felony murder theory did not result in "actual prejudice" to petitioner.   Davis, 135 S. Ct. 2197-98; Brecht, 507 U.S. at 637. Thus, the error did not have a "substantial and injurious effect or influence on determining the jury's verdict."   Brecht, 507 U.S. at 637.   Accordingly, Claim Two is denied and petitioner's habeas corpus petition is denied.

## C.    Certificate of Appealabilty

Under Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, the court must issue or deny a certificate of appealability when it enters a final order adverse to a petitioner.   Petitioner is entitled to a certificate of appealability only if he can make a substantial showing of the denial of a constitutional right.   See Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).   To make a substantial showing, petitioner must show that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed

17

further." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (quotation omitted).   The court finds that

such a showing has been made.   Although the court ultimately concludes that the erroneous

felony murder instruction resulted in harmless error, it finds that the issues presented deserve

encouragement to proceed further and invite further consideration from the reviewing court.

Petitioner is advised that this is a final decision ending his case in this Court.   If petitioner

wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of

judgment.   *See* Fed. R. App. P. 4(a)(1).   Petitioner need not bring a motion to reconsider this

Court's ruling to preserve his appellate rights.   However, if petitioner wishes the Court to

reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or

60(b).   Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment.   *See*

Fed. R. Civ. P. 59(e).   The time to file a motion pursuant to Rule 59(e) cannot be extended.   *See*

Fed. R. Civ. P. 6(b)(2).   A timely Rule 59(e) motion suspends the deadline for filing an appeal

until the Rule 59(e) motion is ruled upon.   *See* Fed. R. App. P. 4(a)(4)(A)(iv).   Any Rule 60(b)

motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3),

must be filed no more than one year after entry of the judgment or order.   *See* Fed. R. Civ. P.

60(c)(1).   The time to file a Rule 60(b) motion cannot be extended.   *See* Fed. R. Civ. P. 6(b)(2).

A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled

upon only if the motion is filed within 28 days of the entry of judgment.   *See* Fed. R. App. P.

4(a)(4)(A)(vi).

## D.   Conclusion

Petitioner's habeas corpus petition [1] is denied on the merits.   Any pending motions are

denied as moot.   The Court will issue a certificate of appealability.   The Clerk is instructed to

enter a judgment in favor of Respondent and against petitioner.     The Clerk shall also alter the

docket to reflect that Respondent is Michael Melvin, Warden, Pontiac Correctional Center, and

alter the case caption to *Czech v. Melvin*.   Civil Case Terminated.


**ENTER:**        **March 24, 2017**


**Robert W. Gettleman**
**United States District Judge**